Lilian S. ILETO, et al., Plaintiffs,

v.

GLOCK, INC., et al., Defendants.

No. CV 01–9762ABC(RNBX).

United States District Court, C.D. California.

March 14, 2006.

Alexander K. Haas, Trial Attorney, U.S. Dept. of Justice, Washington, DC, on behalf of United States.

Carolyn M. Morrissette, Educational Fund to Stop Gun Violence, Washington, DC, Frank D. Hobbs, Geoffrey M. Gold, Rutter Hobbs & Davidoff, Los Angeles, CA, Peter Nordberg, Berger & Montague, Philadelphia, PA, Raymond P. Boucher, Kiesel Boucher & Larson, Beverly Hills, CA, Sayre Weaver, Educational Fund to Stop Gun Violence, La Habra, CA, for Lilian S. Ileto an individual and mother to Joseph S Ileto, deceased, Joshua Stepakoff a minor, by his parents Loren Lieb and Alan B Stepakoff, Mindy Gale Finkelstein a minor by her parents, David and Donna Finkelstein, Benjamin Kadish a minor by his parents Eleanor and Charles Kadish, Nathan Lawrence Powers a minor by his parents, Gail and John Michael Powers, for himself and on behalf of a class of persons similarly situated, Plaintiffs.

Bart L. Kessel, Tucker Ellis and West, Los Angeles, CA, Christopher Renzulli, Renzulli Law Firm, LLP, New York, NY, Robert Nacionales Tafoya, Akin Gump Strauss Hauer & Feld Century Twr. Plz.,

Los Angeles, CA, for RSR Management Corp., RSR Wholesale Guns Seattle Inc., Movants.

Curtiss L. Isler, Tucker Ellis & West, Los Angeles, CA, Mark T. Palin, Atkinson Andelson Loya Ruud & Romo, Cerritos, CA, Andrew B. Serwin, Charles H. Dick, Colin H. Murray, Baker & McKenzie, Koji F. Fukumura, Cooley Godward, San Diego, CA, Stephen J. Martino, Stephen H. Zell, Madory Zell & Pleiss, Tustin, CA, Daniel K. Dik, Todd E. Croutch, Fonda & Fraser, Glendale, CA, Christopher Renzulli, John M. Lambros, Renzulli Law Firm, LLP, New York City, NY, for Glock Inc. a Georgia corporation, Glock GmbH an Austrian business entity, China North Industries Corp a Chinese entity also known as Norinco, Davis Industries a California corporation, Republic Arms Inc a California corporation, Jimmy L Davis an individual, Maadi an Egyptian business entity, Bushmaster Firearms a Maine corporation, Defendants.

## ORDER RE: DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

COLLINS, District Judge.

Defendants' Motion for Judgment on the Pleadings came on for hearing on March 6, 2006. Having considered the parties' submissions, the case file, and counsels' arguments, the Court GRANTS Defendants' Motion.

### PROCEDURAL HISTORY

This case stems from the tragic events of August 10, 1999, in which Bufford Furrow first shot several children at the North Valley JCC and then shot and killed postal worker Joseph Santos Ileto. Plaintiffs Lilian Santos Ileto, sole surviving parent of the deceased; Joshua Stepakoff, a minor through his parents, Loren Lieb and Alan B. Stepakoff; Mindy Finkelstein, a minor, by her parents, David and Donna Finkelstein; Benjamin Kadish, a minor through his parents, Eleanor and Charles Kadish; and Nathan Powers, a minor through his parents, Gail and John Michael Powers, filed a Complaint in Los Angeles Superior Court on August 9, 2000, against Defendants Glock, Inc.; Glock GmbH; China North Industries Corp. ("China North" or "Norinco"); Davis Industries; Republic Arms, Inc.; Jimmy L. Davis; Maadi; Bushmaster Firearms; Imbel; The Loaner Pawnshop Too; David McGee; and 150 Doe Defendants. The Complaint alleged seven causes of action. The first two claims were brought by Ms. Ileto against all Defendants, for survival and wrongful death. The remaining five claims, which included a claim for negligence and a claim for public nuisance, were brought by all plaintiffs against all defendants. The Complaint sought certification of a class, damages, and injunctive relief.

Plaintiffs filed a First Amended Complaint ("FAC") on May 23, 2001. The FAC retained Ms. Ileto's survival and wrongful death claims and Plaintiffs' negligence and public nuisance claims. Plaintiffs did not reassert their remaining claims, including the class claims and the claim for injunctive relief. Plaintiffs did, however, name two additional defendants, RSR Management Corporation and RSR Wholesale Guns Seattle, Inc. (collectively, "RSR").

On October 17, 2001, China North was first served with the initial Complaint. Thereafter, on November 14, 2001, China North removed the action to this Court under 28 U.S.C. § 1330 and 28 U.S.C. § 1603. Defendants then moved to dismiss the case, arguing that even if all of the alleged facts were true, Plaintiffs had nevertheless failed to state a legally cognizable claim. This Court agreed and, accordingly, granted the motions to dismiss.

On appeal, however, the Ninth Circuit reversed this Court's Order as to Plaintiffs' negligence and public nuisance claims and remanded the case back to this Court.[1] Of all the defendants named in the First Amended Complaint, only three remain on remand: Glock, RSR, and China North.

## FACTUAL BACKGROUND

### 1. Allegations in the First Amended Complaint

The allegations in Plaintiffs' First Amended Complaint have been thoroughly summarized in two published opinions. See *Ileto v. Glock*, 194 F.Supp.2d 1040 (C.D.Cal.2002); *Ileto v. Glock Inc.*, 349 F.3d 1191 (9th Cir.2003), *rehearing en banc denied*, 370 F.3d 860 (9th Cir.2004), *cert. denied*, 543 U.S. 1050, 125 S.Ct. 865, 160 L.Ed.2d 770 (2005). Below, the Court quotes the Ninth Circuit's summary of those allegations:

"On August 10, 1999, Furrow approached the North Valley JCC in Granada Hills, California, carrying firearms manufactured, marketed, imported, distributed, and/or sold by the defendants named in this case. When Furrow purchased these guns and at the time of the shooting, federal law prohibited him from possessing, purchasing, or using any firearm.[2] Furrow allegedly had at least the following guns in his possession: Glock Inc's ('Glock's') model 26, a 9mm handgun; China North Industries Corp's ('Norinco's') model 320, a 9mm short-barreled rifle; Maadi's model RML, a 7.62 caliber automatic rifle; Bushmaster's model XM15 E25, a .223 caliber rifle; two of Imbel's model L1A1, a .308 caliber rifle; and Davis Industries' model D 22, a .22 caliber handgun.

"Furrow entered the JCC with this arsenal and proceeded to shoot and injure three young children, one teenager, and one adult with his Glock gun. Two of the young children were plaintiffs Joshua Stepakoff ('Stepakoff'), who was six years old at the time of the shooting, and Benjamin Kadish ('Kadish'), who was five years old at the time of the shooting. Stepakoff was shot twice in the left lower leg and left hip, fracturing a bone. Kadish was shot twice in the buttocks and left leg, fracturing his left femur, severing an artery, and causing major internal injuries. Plaintiff Mindy Finkelstein ('Finkelstein'), a sixteen-year old camp counselor, was shot twice in her right leg. Plaintiff Nathan Powers ('Powers'), a four year-old boy, was not shot, but witnessed and experienced the shootings. The shootings terrified and shocked him, causing him to suffer great mental suffering, anguish, and anxiety as well as severe shock to his nervous system. He suffered severe emotional distress as a result.

1. Plaintiffs did not appeal the Court's decision to dismiss their other claims.

2. "Furrow had been committed to a psychiatric hospital in 1998, indicted for a felony in 1998, and convicted of assault in the second degree in 1999 in the state of Washington. Federal law prohibits a person with a mental defect who has been committed to a mental institution and/or convicted of a felony from purchasing a gun. This prohibition is contained in 18 U.S.C. § 922(d), which provides in pertinent part:

It shall be unlawful for any person to sell or otherwise dispose of any firearm or ammunition to any person knowing or having reasonable cause to believe that such person—
(1) is under indictment for, or has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;
(2) is a fugitive from justice;
(3) is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. § 802));
(4) has been adjudicated as a mental defective or has been committed to any mental institution ...."

"Furrow then fled the JCC with the firearms, and came upon Ileto, a United States Postal Service worker, who was delivering mail in Chatsworth, California. Furrow shot and killed Ileto with his Norinco gun. Nine millimeter bullet casings were recovered at both crime scenes. The Norinco and the Glock guns in Furrow's possession were chambered for 9mm ammunition.[3]

. . .

"On May 23, 2001, the plaintiffs filed their thirty-seven page FAC[.] [Although Plaintiffs initially asserted a number of claims against the manufacturers, distributors, and dealers of the guns Furrow carried with him on the day of the shootings, only the plaintiffs' negligence and public nuisance claims remain.] Below, [the Court] sets forth the core allegations with respect to these claims."

### A. *Facts alleged in the Negligence Claim*

"The first three claims in Count IV include general claims against all defendants, alleging that their 'deliberate and reckless marketing strategies caused their firearms to be distributed and obtained by Furrow resulting in injury and death to plaintiffs.' Plaintiffs also allege that the defendants intentionally produced more firearms than the legitimate market demands with the intent of marketing their firearms to illegal purchasers who buy guns on the secondary market. The plaintiffs also allege that the defendants breached their legal duty to the plaintiffs 'through their knowing, intentional, reckless, and negligent conduct . . . foreseeably and proximately causing injury, emotional distress, and death to plaintiffs.'

"Plaintiffs allege that each of the firearms used by Furrow (the one allegedly used at the JCC, the one used to kill Ileto, and the ones not necessarily fired but carried by Furrow in his arsenal on the day of the shootings) were marketed, distributed, imported, promoted, or sold by each of the defendants in the high-risk, crime-facilitating manner and circumstances described herein, including gun shows, 'kitchen table' dealers, pawn shops, multiple sales, straw purchases, faux 'collectors,' and distributors, dealers and purchasers whose ATF crime-trace records or other information defendants knew or should have known identify them as high-risk. Defendants' practices knowingly facilitate easy access to their deadly products by people like Furrow.

"With respect to Glock, plaintiffs specifically alleged that Glock targets its firearms to law enforcement first to gain credibility and then uses the enhanced value that comes with law enforcement use to increase gun sales in the civilian market. They contend that Glock guns are safe and appropriate for use by well trained elite offensive police forces, but are not appropriate for civilians or unskilled users. In addition, Glock and its distributors encourage police departments to make trade-ins earlier than necessary or originally planned so that they can sell more firearms to the police and sell the former police guns at a mark-up on the civilian market. Glock knows that by over-saturating the market with guns, the guns will go to the secondary markets that serve illegal purchasers.

"The gun that Furrow used to shoot and kill Ileto was purchased originally by a police department in the state of Washington. The plaintiffs allege that Glock and its distributor, RSR Seattle, arranged for the sale of the gun to the police depart-

**3.** "The FAC states that the Norinco, the Glock, and the Davis guns were chambered with 9mm casings. However, in an errata filed after the FAC, plaintiffs noted that only the Glock and the Norinco guns actually were chambered for 9mm ammunition."

ment and its subsequent sale to gun dealers to facilitate the creation of an illegal secondary gun market. The gun was initially shipped to the Cosmopolis Police Department in Washington State along with another gun of the same model. Within one week, the police department determined that the guns were too small to fit into a large person's hand and decided to exchange the guns for another Glock model. The Cosmopolis Police Department contacted a former Police reserve officer, Don Dineen ('Dineen'), who had a gun store in Cosmopolis, to complete the exchange. Dineen contacted RSR Seattle, a Glock distributor, to request two new Glock guns for a trade with the Cosmopolis Police Department. RSR shipped the two guns to Dineen and agreed that payment did not have to be made for the new guns until Dineen was able to sell the former police guns. In a transaction with the police department, Dineen exchanged the two new Glock guns for the two Glock guns rejected by the Department at no cost to the Department. Dineen then was able to sell one of the former Police Department Glock guns at a reduced price to David Wright, a man who claimed to be a gun collector.

"Dineen had introduced Wright to another 'gun collector'[4] named Andrew Palmer, knowing that neither Wright nor Palmer had firearms licenses, and therefore that they did not have to obtain background checks on their purchasers. Dineen also knew that Wright and Palmer frequently sold and traded guns at gun shows in Spokane, Washington, which is near Hayden Lake, Idaho, the home of the Aryan Nations and the Neo Nazi group of which Furrow was a member. Indeed, Wright sold the Glock gun to Palmer at a gun show in Spokane, Washington; at this same gun show, it is alleged that Furrow purchased the Glock gun used in the JCC shootings from Palmer.

"Plaintiffs alleged that all the defendant gun manufacturers and distributors produce, distribute, and sell more firearms than legal purchasers can buy, and that they all 'knowingly participate in and facilitate the secondary market where persons who are illegal purchasers and have injurious intent obtain their firearms.' Furthermore, the plaintiffs allege that the defendant manufacturers and distributors 'select and develop distribution channels they know regularly provide guns to criminals and underage end users. Defendant manufacturers and distributors have been specifically so informed [by the ATF[5]] in connection with [its] crime-gun trac[ing] efforts[.]' Despite this knowledge and information documenting the path of guns to illegal purchasers, the defendant manufacturers and distributors fail to exercise reasonable care to protect the public from the risks created by the distribution and marketing schemes that create an illegal secondary market. Defendants' contracts with their distributors and dealers, and the defendant distributors' contracts with their dealers do not include provisions to address the risks associated with prohibited purchasers. Defendants gain significant revenue from the illegal secondary gun market and therefore fail to adopt the most basic policies and practices that would help to decrease greatly the number of guns reaching prohibited purchasers.

---

**4.** "The Complaint alleges that these 'gun collectors' do not actually collect guns for any purpose other than to sell them without having to comply with the firearm registration system and background checks with which gun store owners must comply with when they sell a gun."

**5.** "The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) is a law enforcement agency within the United States Department of Justice."

"Plaintiffs further alleged that the defendants create and control the distribution channels that provided Furrow, an illegal purchaser and user, with the firearms he used to kill Ileto and to injure the other victims. Defendants knew which distributors and dealers provided guns to illegal purchasers. Defendants knew that their negligent conduct created an unreasonable risk of harm to people like the plaintiffs and that the subsequent creation of an illegal secondary gun markets was a substantial factor contributing to the injuries the plaintiffs suffered. Finally, plaintiffs alleged damages for 'numerous compensable injuries suffered by plaintiffs [that] include but are not limited to personal injury, death, pain and suffering, severe emotional distress, lost companionship, medical expenses, and lost income.'

## B. *Facts alleged in the Nuisance Claim*

"Plaintiffs also allege that the defendants' marketing and distribution policies 'knowingly created and maintained an unreasonable interference with rights common to the general public, constituting a public nuisance under California law.' Plaintiffs allege that defendants market, distribute, promote, and sell firearms, a lethal product, with reckless disregard for human life and for the peace, tranquility, and economic well being of the public. They have knowingly created, facilitated, and maintained an over-saturated firearms market that makes firearms easily available to anyone intent on crime. The particular firearms used in these incidents were marketed, distributed, imported, promoted, and sold by defendants in the manner set out herein, which defendants knew or should have known facilitates and encourages easy access by persons intent on murder, mayhem, or other crimes, including illegal purchasers such as Furrow. Their conduct has thereby created and contributed to a public nuisance by unrea-

sonably interfering with public safety and health and undermining California's gun laws, and it has resulted in the specific and particularized injuries suffered by plaintiffs.

"Although defendants knew about precautions they could have taken to decrease access by prohibited purchasers of their products, they 'knowingly establish[ed], suppl[ied], and maintain[ed] an over-saturated firearms market that facilitates easy access for criminal purposes, including access by persons prohibited to purchase or possess firearms under state or federal law.' Defendants' actions make the public vulnerable to crime and assault and their conduct 'obstructs the free passage or use ... of the public parks, squares, streets, and highways within the meaning of California Penal Code § 370.' As alleged in the FAC, the defendants' interference with rights common to the public is unreasonable and constitutes a nuisance because:

It significantly interferes with the public safety, health or peace. This interference is not insubstantial or fleeting, but rather involves a disruption of public peace and order in that it adversely affects the fabric and viability of the entire community, and a substantial number of persons, within the meaning of California Civil Code § 3480

. . .

It is continuing conduct, and it has produced a permanent or long-lasting effect, and defendants know or have reason to know that it has a significant effect upon the public right. Defendants continually engage in their reckless conduct even though they are continually informed of the resulting substantial, permanent, and long-lasting harm and even as they receive daily notice from the ATF of the distribution channels they use that are doing the most harm. Defendants

have reason to know-and actually know [-] of the disastrous, continuing, and long-lasting effects of their conduct on the public

. . .

Though not necessarily proscribed per se by law, defendants' conduct nevertheless undermines state and federal law restricting gun sales and possession and renders enforcement of such laws difficult or impossible. In this sense, defendants' interference with a common public right is contrary to public policy as established by state and federal law, and the interference is therefore unreasonable.

Plaintiffs seek damages for injuries they suffered as a result of defendants' creation of a public nuisance." *Ileto*, 349 F.3d at 1195–99.

## 2. The Protection of Lawful Commerce in Arms Act

On October 26, 2005, the President of the United States approved the Protection of Lawful Commerce in Arms Act (the "PLCAA" or "Act"), Pub.L. No. 109–92, 119 Stat. 2095. 15 U.S.C. §§ 7901–03 (2005). The PLCAA provides immunity to firearms manufacturers and dealers from any lawsuit, pending or otherwise, fitting the Act's definition of a "qualified civil liability action." *Id.* §§ 7902–03.

The PLCAA defines a "qualified civil liability action" as an action against "a manufacturer or seller of a qualified product, or a trade association" for any type of damages or equitable relief "resulting from the criminal misuse" of a firearm. *Id.* § 7903(5)(A).[6] The Act, however, provides six exceptions to this definition. *Id.* § 7903(5)(A)(i)-(iv).[7] Assuming a given ac-

---

6. Section 7903(5)(A), in pertinent part, states: The term "qualified civil liability action" means a civil action or proceeding or an administrative proceeding brought by any person against a manufacturer or seller of a qualified product, or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party[.]
15 U.S.C. § 7903(5)(A).

7. The exceptions to a "qualified civil liability action are as follows:
(i) an action brought against a transferor convicted under section 924(h) of Title 18, or a comparable or identical State felony law, by a party directly harmed by the conduct of which the transferee is so convicted;
(ii) an action brought against a seller for negligent entrustment or negligence per se;
(iii) an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought, including—
(I) any case in which the manufacturer or seller knowingly made any false entry in, or failed to make appropriate entry in, any

record required to be kept under Federal or State law with respect to the qualified product, or aided, abetted, or conspired with any person in making any false or fictitious oral or written statement with respect to any fact material to the lawfulness of the sale or other disposition of a qualified product; or
(II) any case in which the manufacturer or seller aided, abetted, or conspired with any other person to sell or otherwise dispose of a qualified product, knowing, or having reasonable cause to believe, that the actual buyer of the qualified product was prohibited from possessing or receiving a firearm or ammunition under subsection (g) or (n) of section 922 of Title 18;
(iv) an action for breach of contract or warranty in connection with the purchase of the product;
(v) an action for death, physical injuries or property damage resulting directly from a defect in design or manufacture of the product, when used as intended or in a reasonably foreseeable manner, except that where the discharge of the product was caused by a volitional act that constituted a criminal offense, then such act shall be considered the sole proximate cause of any resulting death, personal injuries or property damage; or

tion against a firearms manufacturer or dealer falls within one of these exceptions, the action can proceed.

Two provisions of the PLCAA are particularly relevant to this case. The first is the Act's retroactive provision, which requires the "immediate[ ] dismiss[al]" of any "pending action" fitting the Act's definition of a "qualified civil liability action." *Id.* § 7902(b). The second concerns one of the six exceptions to the definition of a "qualified civil liability action"—specifically, the exception located at § 7903(5)(A)(iii) ("the predicate exception"). Under the predicate exception, firearms manufacturers and dealers are still liable if they "knowingly violated a State or Federal statute applicable to the sale or marketing" of a firearm, and the violation proximately caused the harm for which relief is sought. *Id.* § 7903(5)(A)(iii).

On November 9, 2005, just two weeks after the PLCAA became effective, Defendants Glock and RSR (hereinafter, "Defendants") filed a Motion for Judgment on the Pleadings. Therein, they argue that each of Plaintiffs' causes of action meets the PLCAA's definition of a "qualified civil liability action."

On December 21, 2005, Plaintiffs filed an Opposition to Defendants' Motion. In their Opposition, Plaintiffs maintain that this lawsuit should not be dismissed for two reasons. First, Plaintiffs contend that each of their claims falls within the predicate exception to the PLCAA. Second, they assert that, even if their claims fall outside of the predicate exception, the Court should not dismiss their causes of action because the PLCAA, as applied to Plaintiffs, is unconstitutional. Defendants filed a Reply on January 17, 2006.

Because Plaintiffs' Opposition challenged the constitutionality of the PLCAA, the Government intervened for the limited purpose of rebutting this challenge. Thereafter, on January 17, 2006, the Government filed a memorandum supporting the constitutionality of the PLCAA. On February 16, 2006, Plaintiffs filed a Reply to the Government's memorandum.

## DISCUSSION

### A. Neither of Plaintiffs' Causes of Action Fall Within the Predicate Exception to the PLCAA.

Plaintiffs contend that the PLCAA does not require the dismissal of their suit because each of their causes of action falls within the predicate exception. Specifically, Plaintiffs note that each of their causes of action alleges that Defendants violated a California statute that is capable of being applied to the sale or marketing of firearms. Accordingly, they conclude that the plain language of the statute, and of the predicate exception in particular, dictates that this action falls outside the definition of a qualified civil liability action.

Defendants, on the other hand, contend that this suit is a prime example of the type of suit that the PLCAA was intended to prevent. According to Defendants, Plaintiffs' causes of action, each of which is based on a violation of a generally applicable state statute, fall outside of the predicate exception. That exception, according to Defendants, was intended to apply only to violations of State and Federal statutes specifically applicable to the sale or marketing of firearms. To construe the predicate exception any other way, according to Defendants, would undermine the clear in-

---

(vi) an action or proceeding commenced by the Attorney General to enforce the provisions of chapter 44 of Title 18 or chapter 53 of Title 26."

15 U.S.C. § 7903(5)(A)(i)-(iv).

tent of the PLCAA. Accordingly, Defendants conclude that Plaintiffs' causes of action fall squarely within the definition of the PLCAA's definition of a "qualified civil liability action."

■ "The purpose of statutory construction is to discern the intent of Congress in enacting a particular statute. The first step in ascertaining congressional intent is to look to the plain language of the statute." *United States v. Daas*, 198 F.3d 1167, 1174 (9th Cir.1999) (citations omitted). "It is well established that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'" *Lamie v. United States Trustee*, 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.*, 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000)).

"To determine the plain meaning of a particular statutory provision, and thus congressional intent, the court looks to the entire statutory scheme. If the statute uses a term which it does not define, the court gives that term its ordinary meaning." *Daas*, 198 F.3d at 1174. To determine the "plain meaning" of a term undefined by a statute, the court may resort to a dictionary. *Cleveland v. City of Los Angeles*, 420 F.3d 981, 990 (9th Cir.2005). The court should be cautious of relying too heavily on dictionary definitions, however, because rigid adherence to such definitions may result in an interpretation that conflicts with the legislature's intent in enacting the given statute. *See* Norman J. Singer, 2A *Sutherland Statutory Construction* § 46:2 (6th ed.); *see also United States v. Wenner*, 351 F.3d 969 (9th Cir. 2003) (rejecting dictionary definition of "dwelling" in construing burglary statute because dictionary definition was broader than uniform federal definition).

Whether or not this case fits within the predicate exception to the PLCAA's definition of a "qualified civil liability action" hinges on what Congress meant when it used the word "applicable" in the predicate exception. As discussed below, the Court cannot apply the plain meaning of the word "applicable" in interpreting the PLCAA for two reasons. First, the word is ambiguous in light of other provisions within the PLCAA. Second, if the Court applies the plain meaning of "applicable," the resulting statutory meaning would undermine the clear purpose of the PLCAA. The Court addresses these reasons in turn below.

### 1. The Word "Applicable" is Ambiguous as Used in the PLCAA.

Although the plain meaning of the statute necessarily marks the beginning point in statutory construction, it does not follow that the Court must apply a literal interpretation of the statute in all instances. Where, for example, a given word or term in the statute is ambiguous, the court turns to the statute's legislative history for evidence of congressional intent. *United States v. Ventre*, 338 F.3d 1047, 1052 (9th Cir.2003). A statute is ambiguous when it is capable of being understood by reasonably informed persons in two or more different senses. Singer, *supra* § 46:4.

In analyzing a statutory text, the court must avoid interpreting words in isolation. *Leisnoi, Inc. v. Stratman*, 154 F.3d 1062, 1066 (9th Cir.1998). "[B]ecause words can have alternative meanings depending on context, we interpret statutes, not by viewing individual words in isolation, but rather by reading the relevant statutory provisions as a whole." *Id.* (internal quotations and citations omitted). This approach reflects the understanding that a provision that may seem ambiguous in isolation often becomes clear when considered against

the statutory scheme or vice versa. *Int'l Ass'n of Machinists & Aerospace Workers, Local Lodge 964 v. BF Goodrich Aerospace Aerostructures Group,* 387 F.3d 1046, 1051–52 (9th Cir.2004).

As the Court considers the meaning of the predicate exception's use of the word "applicable," it notes that the meaning of this word has already been challenged in another court. Recently, in *City of New York v. Beretta,* 401 F.Supp.2d 244 (E.D.N.Y.2005), a New York District Court addressed nearly identical arguments to those raised by the parties in this case. To determine Congress's intent, the district court looked to several dictionary definitions, which by and large defined the word "applicable" as "capable of being applied," or words to that effect. *Beretta,* 401 F.Supp.2d at 261–62.[8] The district court also cited a handful of state and federal cases that had interpreted "applicable" in the same manner, although none of those cases dealt with or interpreted any provision of the newly-enacted PLCAA. *Id.* (citing *Snyder v. Buck,* 75 F.Supp. 902, 907 (D.D.C.1948); *Whalin v. Sears Roebuck & Co.,* No. 94 C 1518, 1995 WL 68823, at *3 (N.D.Ill. Feb.13, 1995); *Interwest Constr. v. Palmer,* 923 P.2d 1350 (Utah 1996); *Whitney v. American Fidelity Co.,* 350 Mass. 542, 215 N.E.2d 767 (1966)).

Based on these authorities, the *Beretta* Court found that the word "applicable"

was unambiguous and, as such, readily understandable as "capable of being applied." *Id.* at 263–64. The district court further noted that Congress could have limited the reach of the predicate exception to violations of State and Federal statutes " 'directly or specifically' regulating the sale or marketing of firearms," but failed to do so. *Id.* at 264. Accordingly, the *Beretta* Court concluded that Congress intentionally omitted such limiting language from the predicate exception. *See id.*

This Court respectfully disagrees with the *Beretta* Court's conclusion that the word "applicable" is not ambiguous. The Court's disagreement with this conclusion stems primarily from its view that the *Beretta* Court apparently defined and interpreted the word "applicable" without considering that definition in the context of the entire statutory scheme. Although the district court referred to the need to determine a phrase's meaning in context, it did so only to emphasize that "canons of construction cannot be used to avoid the plain meaning of a statute." *Id.* The *Beretta* Court, however, never actually analyzed how the word "applicable" operates in the context of the statutory scheme as a whole.

Although easily understood standing alone in the cold context of a dictionary, the word "applicable" nevertheless becomes ambiguous when read against the other provisions of the PLCAA.[9] For ex-

---

**8.** "[T]he *Standard Dictionary* defines the word 'applicable' as follows: 'Applicable, capable of being applied; suitable or fit for application; relevant; fitting.' *Webster's Dictionary* contains the following definition: 'Capable of being applied; fit; suitable; pertinent.' *Black's Law Dictionary,* 3d Ed ... defines the term as follows: 'Applicable, fit, suitable, pertinent, or appropriate.' The Oxford American Dictionary defines 'applicable' as 'that [which] may be applied.' *Oxford American Dictionary and Language Guide* 42 (1999)." *Beretta,* 401 F.Supp.2d at 262 (citations and some internal quotations omitted).

**9.** Moreover, the Court finds the *Beretta* Court's reliance on state and federal case law defining the word "applicable" equally unpersuasive. Indeed, none of the cases cited by the district court addressed the word "applicable" as used in the PLCAA, nor could they have, considering that each such case predated the PLCAA. Thus, the Court fails to see how these courts' respective interpretations of completely unrelated statutes bears any relevance to the meaning of the word "applicable" in the specific context of the PLCAA.

ample, in the congressional findings section of the Act, Congress explicitly stated that firearm sales are heavily regulated by "Federal, State, and local laws." 15 U.S.C. § 7901(a)(4). In the following sentence, the legislature provided three different examples of these regulations—each of which is a federal law that specifically applies to the sale and marketing of firearms. Id.[10] Notably, this part of the statute, like the predicate exception, refers to State and Federal laws. Given this similarity, a reasonable person could surely conclude that the legislature's subsequent reference to violations of State and Federal statutes in the predicate exception likewise referred to the same type of State and Federal laws referenced earlier in the congressional findings.

Likewise, the examples of State and Federal statutory violations in the predicate exception itself also call into question the meaning of the word "applicable."

Neither of the examples implicates laws of general applicability, which would be merely "capable of being applied" to the sale or marketing of firearms. Instead, both examples involve violations of State and Federal laws that apply exclusively to the firearms industry. See 15 U.S.C. § 7903(5)(A)(iii)(I)-(II).[11] Because these examples refer only to State and Federal laws exclusive to the firearms industry, they strongly suggest that the word "applicable" in the lines preceding them likewise refers to State and Federal laws governing only firearms.

Although these specific examples by no means dictate the meaning of the general language preceding them at this stage in the Court's analysis,[12] they are nevertheless relevant to determining whether or not the word "applicable" is ambiguous. And while these examples do not, in and of themselves, render the word "applicable" ambiguous, they are not the only part of

10. Section 7901(a)(4) states:

> The manufacture, importation, possession, sale, and use of firearms and ammunition in the United States are heavily regulated by Federal, State, and local laws. Such Federal laws include the Gun Control Act of 1968, the National Firearms Act, and the Arms Export Control Act.
> 15 U.S.C. § 7901(a)(4).

11. Specifically, the examples in the predicate exception state the following:

> (I) any case in which the manufacturer or seller knowingly made any false entry in, or failed to make appropriate entry in, any record required to be kept under Federal or State law with respect to the qualified product, or aided, abetted, or conspired with any person in making any false or fictitious oral or written statement with respect to any fact material to the lawfulness of the sale or other disposition of a qualified product; or
> (II) any case in which the manufacturer or seller aided, abetted, or conspired with any other person to sell or otherwise dispose of a qualified product, knowing, or

> having reasonable cause to believe, that the actual buyer of the qualified product was prohibited from possessing or receiving a firearm or ammunition under subsection (g) or (n) of section 922 of Title 18[.]
> 15 U.S.C. § 7903(5)(A)(iii)(I)-(II).

12. In determining whether the word "applicable" is ambiguous, the Court does not apply the statutory doctrine of ejusdem generis, which translates simply as "of the same kind." The doctrine of ejusdem generis applies when general words in a statute are followed by specific words. In such a case, ejusdem generis limits the meaning of the general words to things that are similar to those specifically enumerated subsequently. Singer, supra § 46:2. But this doctrine comes into play only after a court has concluded that the intent of Congress is unclear. Id.; Microsoft Corp. v. C.I.R., 311 F.3d 1178, 1186 (9th Cir.2002); Donovan v. Anheuser–Busch, Inc., 666 F.2d 315, 326 (8th Cir.1982). Thus, it has no bearing on the Court's analysis at this stage because, here, the Court determines only whether the plain meaning of the word "applicable" is ambiguous.

the statute that calls the meaning of the word "applicable" into question. Indeed, the examples must be read alongside the congressional findings about the heavy State and Federal regulations governing all aspects of the firearms industry—including sales. *See* 15 U.S.C. § 7901(a)(4).

In that context, the predicate exception's use of the word "applicable" gives rise to at least two reasonable meanings regarding knowing violations of State and Federal statutes. On the one hand, it could mean, as the *Beretta* Court found, that the exception applies to knowing violations of any State or Federal statute capable of being applied to the sale or marketing of firearms. On the other hand, it could just as easily mean that the exception applies only to knowing violations of State and Federal statutes specifically applicable to the firearms industry.

Additionally, rather than clarifying the issue, the relevant dictionary definitions only blur the meaning of the PLCAA's use of "applicable." Although "applicable" is often defined as "capable of being applied," the word "apply," from which "applicable" is derived, is defined in a way that would be most commonly understood as narrower than the sweeping "capable of being applied." Indeed, *Black's Law Dictionary* defines "apply" as either "[t]o employ for a limited purpose" or "[to] put to use with a particular subject matter." *Black's Law Dictionary* 109 (8th ed.2004); *see also Webster's Third Int'l. Dictionary* 105 (1993) (defining "apply" as "to use for a particular purpose or in a particular case").

Although, as the *Beretta* Court showed, these definitions are compatible when viewed from a purely intellectual point of view, they nevertheless differ when one considers their commonly understood meaning, which trumps all alternative meanings in statutory interpretation. *United States v. O'Neil*, 11 F.3d 292, 295

(1st Cir.1993) ("[I]nflexible insistence upon a particular version of lexicographic orthodoxy seemingly overlooks that 'the plain-meaning doctrine is not a pedagogical absolute.' ") (quoting *Greenwood Trust Co. v. Com. of Mass.*, 971 F.2d 818, 825 (1st Cir.1992)). The Court finds it hard to believe that the average Congressman, let alone the average person, would equate the term "to put to use with a particular [or limited] subject matter" with the term "capable of being applied." The first term suggests a limitation; indeed, the term uses a restrictive word, namely "particular" or "limited." The second term, by contrast, invites the reader to consider the most expansive reach in determining the theoretical limits of applicability. Thus, while lexicographers could read these definitions in harmony, such a reading would ignore how these definitions are commonly understood.

This is not to say that the *Beretta* Court's interpretation of the predicate exception's use of the word "applicable" is by any means unreasonable. On the contrary, the district court set forth thoughtful arguments supporting its interpretation. Rather, it shows that reasonable minds could differ as to the meaning of "applicable" in the context of the entire statutory scheme.

In sum, for all of these reasons, the Court finds that the PLCAA's use of the word "applicable" in the predicate exception is ambiguous.

**2. Applying an Expansive Reading of the Word "Applicable" Would Undermine the Clear Purposes of the PLCAA.**

A court should not apply the plain meaning of a statute when doing so "would thwart the purpose of the over-all statutory scheme or lead to an absurd result." *Brooks v. Donovan*, 699 F.2d 1010, 1011

(9th Cir.1983) (citations omitted); *Albertson's Inc. v. Commissioner of Internal Revenue*, 42 F.3d 537, 545 (9th Cir.1994) ("We may not adopt a plain language interpretation of a statutory provision that directly undercuts the clear purpose of the statute."); *Bob Jones University v. United States*, 461 U.S. 574, 586–92, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983) (finding that statute listing specific examples of tax-exempt organizations necessarily required organizations to serve a valid charitable purpose because interpreting statute otherwise would defeat bill's purpose).

When a statute governing a specific industry refers to compliance with undefined or unrestricted "laws," a court may interpret the statute as referring only to laws specifically applicable to the relevant industry. *See United States ex rel. North Santiam Watershed Council v. Kinross Gold, USA, Inc.*, No. C 96–3673–THE, 1998 WL 118176, at *5–6 (N.D.Cal. March 9, 1998). In *Kinross Gold*, for example, the court interpreted a provision of the General Mining Act of 1872 requiring mining companies seeking to obtain mineral asset rights to be in compliance "with the laws of the United States." *Kinkross Gold*, 1998 WL 118176 at *1. Relying on this provision of the Mining Act, the plaintiff sued a group of mining companies for failing to comply with a federal registration law that was not specifically related to federal mining laws. *Id.* Noting that Congress could not possibly have intended the Mining Act to require compliance with all federal laws, the district court found that the disputed term referred only to federal mining laws. *Id.* at *5–6. Thus, because the plaintiff based its claim on the mining companies' failure to comply with a non-mining-specific federal law, the claim was dismissed. *Id.* at *6.

Here, the clear purpose of the PLCAA was to shield firearms manufacturers and dealers from liability for injuries caused by third parties using non-defective, legally obtained firearms. *See, e.g.,* 15 U.S.C. § 7901(b)(1); [13] 15 U.S.C. § 7903(5)(A).[14] Congress also believed that lawsuits seeking to hold firearms manufacturers liable for a third party's misuse of a firearm imposed an undue burden on interstate commerce. *See* 15 U.S.C. § 7901(a)(3),[15] (b)(4).[16]

---

13. Section 7901(b)(1) states:
 The purposes of this chapter are as follows ... [t]o prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms or ammunition products, and their trade associations, for the harm solely caused by the criminal or unlawful misuse of firearm products or ammunition products by others when the product functioned as designed and intended.
 15 U.S.C. § 7901(b)(1).

14. Section § 7903(5)(A) states:
 The term "qualified civil liability action" means a civil action or proceeding or an administrative proceeding brought by any person against a manufacturer or seller of a qualified product, or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or un-

lawful misuse of a qualified product by the person or a third party[.]
 15 U.S.C. § 7903(5)(A).

15. Section 7901(a)(3) states:
 Congress finds [that] ... [l]awsuits have been commenced against manufacturers, distributors, dealers, and importers of firearms that operate as designed and intended, which seek money damages and other relief for the harm caused by the misuse of firearms by third parties, including criminals.
 15 U.S.C. § 7901(a)(3).

16. Section 7901(b)(3) states:
 The purpose[ ] of this chapter [is] ... [t]o prevent the use of such lawsuits to impose unreasonable burdens on interstate and foreign commerce.
 15 U.S.C. § 7901(b)(3).

Interpreting the word "applicable" in the predicate exception to mean any State or Federal statute "capable of being applied" to the sale or marketing of firearms would undermine this clearly stated purpose. Such a broad interpretation would create an exception so large that it would effectively render the entire PLCAA meaningless. Indeed, if a knowing violation of any statute capable of being applied to the sale of firearms could trigger the exception, one wonders whether the PLCAA would actually *expand* the firearms industry's scope of liability. *Cf.* 15 U.S.C. § 7901(a)(7) (criticizing "liability actions" against the firearms industry that run the risk of "expand[ing] civil liability" in ways not previously contemplated).

Moreover, construing the word "applicable" in the predicate exception to mean "capable of being applied" would undermine not only the PLCAA's over-arching purpose, but also other specific statutory provisions of the PLCAA. Indeed, such an interpretation invites creative attorneys to develop novel theories under existing State and Federal statutes of general applicability to hold firearms manufacturers and dealers liable for the actions of third parties using "qualified" products. This result, however, flies in the face of Congress's stated disdain for applying such novel theories of liability against the firearms industry:

> Congress finds [that] . . . [t]he liability actions commenced or contemplated by the Federal Government, States, municipalities, and private interest groups and others are based on theories without foundation in hundreds of years of the

common law and jurisprudence of the United States and do not represent a bona fide expansion of the common law. The possible sustaining of these actions by a maverick judicial officer or petit jury would expand civil liability in a manner never contemplated by the framers of the Constitution, by Congress, or by the legislatures of the several States. Such an expansion of liability would constitute a deprivation of the rights, privileges, and immunities guaranteed to a citizen of the United States under the Fourteenth Amendment to the United States Constitution.

15 U.S.C. § 7901(a)(7). This language forecloses any argument suggesting that Congress intended any provision of the PLCAA to allow, let alone encourage, the development of novel theories of liability based on violations of generally applicable State and Federal statutes. But this is precisely the result that would occur if the Court applies a literal interpretation of the word "applicable" to the predicate exception.

Likewise, interpreting "applicable" to mean "capable of being applied" would undermine Congress's goals of preserving the separation of powers and "important principles of federalism." *See id.* § 7901(b)(6). Congress believed that groups were using "liability actions" as an end-run around the legislature to establish *de facto* stricter regulations on the firearms industry. *Id.* § 7901(a)(8).[17] This practice, according to Congress, "threaten[d] the Separation of Powers doctrine and weaken[ed] and undermin[ed] impor-

---

**17.** Section 7901(a)(8) states:

The liability actions commenced or contemplated by the Federal Government, States, municipalities, private interest groups and others attempt to use the judicial branch to circumvent the Legislative branch of government to regulate interstate and foreign commerce through

judgments and judicial decrees thereby threatening the Separation of Powers doctrine and weakening and undermining important principles of federalism, State sovereignty and comity between the sister States.

15 U.S.C. § 7901(a)(8).

tant principles of federalism, State sovereignty and comity between the sister States." *Id.* Congress, therefore, enacted the PLCAA, in part, to curb this perceived abuse of the legal system.

Rigidly adhering to the plain meaning of "applicable," however, would directly undermine this aspect of the PLCAA. Indeed, consider the facts of this case as an example. If Plaintiffs were to succeed in this action, the result would be that Defendants would have to change their behavior to avoid further liability in California, even if they did not violate any State or Federal laws specifically governing the sale or marketing of firearms.[18] This change in behavior, however, could not be limited to guns sold and marketed in California. Rather, it would necessarily extend to any area throughout the entire country where the possibility exists that a qualified product might find its way into California and later be misused by a third party. Consequently, a successful prosecution of this lawsuit would promote at least two things that the PLCAA sought to eliminate—namely, using litigation to circumvent the legislative branch and using such lawsuits to create an undue burden on interstate commerce. *See* 15 U.S.C. § 7901(a)(8), (b)(4), (b)(6).

Given these clear congressional findings and purposes, Congress could not have intended the predicate exception to apply whenever a firearms manufacturer or dealer knowingly violated a State or Federal statute capable of being applied to the sale or marketing of firearms. Rather, as in *Kinross,* where compliance with "all" federal laws made sense only if limited to laws specifically regulating the mining in-

dustry, the PLCAA's use of "applicable" likewise makes sense in the context of the statutory scheme only if it is limited to laws specifically applicable to the firearms industry. ·

Finally, interpreting "applicable" to mean "capable of being applied" ignores the other provisions in the statute referring to State and Federal laws specifically regulating the firearms industry. As discussed earlier, the PLCAA highlighted the fact that firearm sales, as well as all other aspects of the firearms industry, are "heavily regulated" by State and Federal laws. Moreover, the examples in the PLCAA of "knowing[ ] violat[ions] of State and Federal statutes" involve only violations of State and Federal laws exclusively applicable to the firearms industry, and to the sale of firearms specifically. While this fact, standing alone, would not be enough to override the statute's plain meaning, this fact must be considered in light of the Act's findings and purposes. In this context, it becomes clear that Congress did not intend for the word "applicable" in the predicate exception to mean "capable of being applied." [19] Indeed, a contrary finding would require the Court to ignore the fact that every single example of a State or Federal statute mentioned, or referred to, in the PLCAA applies exclusively to the firearms industry. *See* 15 U.S.C. § 7901(a)(4); § 7903(5)(A)(iii)(I)-(II).

In short, the plain language of "applicable," as used in the predicate exception, conflicts with the clear purpose of the PLCAA.

---

**18.** Plaintiffs do not argue that their case fits within any of the other exceptions to the definition of a "qualified civil liability action." *See* 15 U.S.C. § 7903(5)(A)(i)-(vi). Accordingly, the Court does not address those exceptions.

**19.** At this point in the Court's analysis, the Court makes no definitive finding as to what Congress intended the word "applicable" to mean.

### 3. Extrinsic and Intrinsic Aids Show That Congress Intended the Predicate Exception to Apply Only to Violations of State and Federal Statutes Specifically Applicable to the Firearms Industry.

■ Having found the plain meaning of the word "applicable" both ambiguous and contrary to the clear purpose of the PLCAA, the Court must now determine what Congress intended "applicable" to mean in the context of the predicate exception. To do so, the Court looks first to the legislative history and then to relevant canons of statutory construction. As explained below, both sources show that Congress intended the predicate exception to apply only to State and Federal statutes specifically governing the firearms industry.

#### a. Legislative History of the PLCAA

The legislative history of the PLCAA strongly indicates that Congress intended the predicate exception to apply only to knowing violations of State and Federal statutes specifically applicable to the firearms industry.[20] First, to the extent that any proponents of the bill mentioned violations of State or Federal laws, they referred only to violations of State and Federal laws specific to the firearms industry:

"Let me again say, as I said, if in any way they violate State or Federal law or alter or fail to keep records that are appropriate as it relates to their inventories, they are in violation of law. This bill does not shield them, as some would argue. Quite the contrary. If they have violated existing law, they violated the law, *and I am referring to the Federal firearms laws that govern a licensed firearm dealer and that govern our manufacturers today.*"

151 Cong. Rec. S9087–01 (statement of Sen. Craig) (emphasis added).

Today, we are addressing one portion of that in trying to stop gun manufacturers from being sued erroneously. There are many areas in which you can sue a gun manufacturer. If the gun malfunctioned, then that kind of lawsuit, of course, would be allowed. They would also be allowed where *there is a knowing violation of a firearms law,* when the violation is the proximate cause of the harm for which the relief is sought.

151 Cong. Rec. S9217–02 (statement of Sen. Hutchison) (emphasis added).

I know it is hard to believe, but that is the theory of these lawsuits. That theory is you sold a gun lawfully, OK. You followed the complex Federal regulations that have a huge host of requirements. You followed the State legislature's requirements, often very complex, also, to the T, and it comes in the hand of a criminal, and they use it for a crime. Now the manufacturer and the seller are liable. What kind of law is that? We do not need that. These lawsuits are hap-

---

**20.** Moreover, the Court notes that the clear legislative history further supports the Court's decision not to apply a literal meaning of the word "applicable" in the predicate exception. Even if the words of a statute are plain and unambiguous on their face, a court may still look to legislative history in construing a statute where the statute's plain meaning contradicts the expressed legislative intent in enacting the statute. *Escobar Ruiz v. I.N.S.,* 838 F.2d 1020, 1023 (9th Cir.1988), *overruled on other grounds by Rueda–Menicucci v. I.N.S.,* 132 F.3d 493 (9th Cir.1997); *Flores–Arellano v. I.N.S.,* 5 F.3d 360, 363 (9th Cir.1993) ("Under the established approach to statutory interpretation, we rely on plain language in the first instance, but always look to legislative history in order to determine whether there is a clear indication of contrary intent.") (Reinhardt, specially concurring); *see also National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers,* 414 U.S. 453, 458, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974) ("[E]ven the most basic general principles of statutory construction must yield to clear contrary evidence of legislative intent.").

pening, and so all this would say is that those kinds of lawsuits cannot be brought.

151 Cong. Rec. S8908–01 (statement of Sen. Sessions).[21]

Indeed, even Senator Jack Reed, the bill's most vocal opponent in the Senate, understood that the predicate exception applied only to statutes specifically regulating guns sales and marketing:

> Here is what essentially this legislation does in lots of respects. It says we are disregarding those instances where one has a duty to someone under the civil law. We will let them proceed with their suit if there is a criminal violation or a statutory violation, a violation of regulations, but for the vast number of other responsibilities we owe to each other, that are defined for the civil law, one will not have the opportunity to go to court.

151 Cong. Rec. S9217–02 (statement of Sen. Reed); *see also* 151 Cong. Rec. S9217–02 (statement of Sen. DeWine) ("If this bill were to become law, a plaintiff would not only have to demonstrate that a gun dealer acted negligently, but also that the gun dealer broke the law—broke the criminal law. In other words, the plaintiff would—with one lone exception that has already been talked about on the floor a few moments ago—have to prove the gun dealer violated a statute or is guilty of a crime."). In short, the bill's proponents and its opponents labored under the same understanding of the predicate exception. Both understood that it applied only to violations of statutes specifically applicable to the sale or marketing of firearms.[22]

**21.** The legislative history contains numerous other examples of quotes that provide an understanding of the legislature's intent to have the predicate exception apply only to violations of firearms-specific laws. *See, e.g.,* 151 Cong. Rec. S9217–02 (statement of Sen. Craig reading *Wall Street Journal* article into record) ("The gun makers aren't seeking immunity from all liability; they would continue to face civil suits for defective products or for violating sales regulations.") (quoting "Gun Liability Control," *Wall Street Journal,* July 25, 2005); 151 Cong. Rec. S8908–01 (statement of Sen. Sessions) ("It is simply wrong . . . to allow those manufacturers who comply with the many rules we have set forth—they comply with those rules, to be sued for intervening criminal acts . . . If they knew, if they had reason to know, if they were negligent in going through the requirements of the law or failed to do the requirements of the law, they can be sued. But if they do it right and it goes into the hands of someone who uses it for a criminal purpose, the manufacturer of that gun absolutely should not be subject to a lawsuit."); 151 Cong. Rec. S8908–01 (statement of Sen. Sessions) ("The problem we are dealing with is the possibility that courts will create legal liability on a manufacturer of a lawful product, a lawful product that has been sold according to the strict requirements of Federal and State law, and that they somehow become an insurer of everything wrong that occurs as a result of the utilization of that lawful product."); 151 Cong. Rec. S9217–02 (statement of Sen. Graham) ("So this bill does not allow someone to sell a gun without following the procedures that we have set out to sell a gun.").

**22.** Likewise, in referring to the predicate exception, senators on both sides of the issue characterized it as applying to knowing violations of a statute "related to" the sale or marketing of a firearm. *See* 151 Cong. Rec. S8927–01 (statement of Sen. Reed) ("Knowing violation of the law exception: This exception applies where a gun seller or manufacturer knowingly violates a State or Federal statute when it makes a sale that leads to an injury. Here, Kahr Arms did not violate statutes *related to the sale or manufacturing* of a gun. Rather, Kahr's employees surreptitiously took the guns out.") (emphasis added); 151 Cong. Rec. S9246–02 (statement of Sen. Santorum) ("This bill provides carefully tailored protections that continue to allow legitimate suits based on knowing *violations of Federal or State law related to gun sales,* or on traditional grounds including negligent entrustment, such as sales to a child or an obviously intoxicated person or breach of contract.") (emphasis added). While by no means dispositive of congressional intent, these statements nevertheless add to the existing evi-

Second, the resounding defeat of amendments seeking to expand the bill's exceptions further illustrates that Congress did not intend for the predicate exception to apply to laws of general applicability. For example, an amendment proposed by Senator Carl Levin would have added an exception to the definition of a qualified civil liability action for cases in which a firearm manufacturer's or dealer's gross negligence or reckless conduct was a proximate cause of death or injury. 151 Cong. Rec. S9087–01 (statement of Sen. Levin). The proponents of PLCAA attacked this amendment, primarily because they believed that it would effectively "gut" the Act:

> I rise in strong support of the Protection of Lawful Commerce in Arms Act and in opposition to these amendments that will be offered this afternoon, all of which are designed to gut the underlying legislation.

151 Cong. Rec. S9374–01 (statement of Sen. Thune).

> Mr. President, I rise in opposition to the amendment that has been proposed by the Senator from Michigan and cosponsored by the Senator from Minnesota. While this amendment appears to be innocuous, it would actually gut the very underlying purpose of this legislation.

151 Cong. Rec. 9217–01 (statement of Sen. Cornyn); see also 151 Cong. Rec. S9217–02 (statement of Sen. Kyl) (stating that Levin Amendment would "totally undercut[ ] the purpose" of the bill).

Likewise, another amendment proposed by Senator Reed seeking to ensure the survival of the traditional negligence cause of action against firearms manufactures and dealers generated the same attacks from the bill's proponents: [23]

> This is a complete substitute for the bill. In effect, it guts the bill. It does exactly the opposite of what the bill is intended to do, and that is to stop abusive predatory lawsuits against law-abiding businesses for damages caused by the criminal misuse of their products by others.

151 Cong. Rec. S9374–01 (statement of Sen. Hutchison).

> The Reed substitute, as the Senator from Texas has said, simply guts it, changes the whole intent of the bill very dramatically.

151 Cong. Rec. S9374–01 (statement of Sen. Craig).

While these amendments did not speak directly to the predicate exception, their resounding defeats further illustrate that the proponents of the PLCAA sought to limit the reach of the predicate exception. Otherwise, the PLCAA's proponents would have had no reason to oppose either amendment. Indeed, the Levin Amendment in particular, which spoke only to civil causes of action for gross negligence and recklessness, would have created a much narrower exception than the one that would result if the predicate exception embraced violations of any State or Federal statute capable of being applied to the sale and marketing of firearms. Yet, the Levin Amendment, as well as the broader Reed Amendment, failed to gain support in the Senate and, in fact, generated vocal

---

dence regarding the legislative intent behind the predicate exception.

**23.** "My amendment has an overarching purpose, to preserve the right of an individual to sue for negligence when they have been harmed and when that negligence can be fairly attributed to a gun manufacturer, gun dealer, or a gun trade association. It does not depart from the principles of the law. In fact, it embraces the fundamental principle of the law which says if someone owes you a duty of care and violates that duty and you have been harmed, you have a right to go into court." 151 Cong. Rec. S9374–01 (statement of Sen. Reed).

opposition. Their defeat, therefore, leads to the conclusion that the PLCAA's supporters likewise did not intend for the predicate exception to apply to even farther-reaching statutory causes of action with no specific application to the firearms industry.

Third, the legislative history provides additional evidence regarding the predicate exception's applicability to cases such as this one. Indeed, during debate on this bill, the respective sponsors of the bill in both the Senate and in the House of Representatives cited this very case as a prime example of the type of lawsuit the bill was designed to prevent. *See*, 51 Cong. Rec. E2162–03 (statement of Rep. Stearns); 151 Cong. Rec. S9374–01 (statement of Sen. Craig). Indeed, Representative Stearns, the bill's sponsor in the House, characterized this case as an extreme example of the problem that the Act was meant to address:

> I want the Congressional Record to clearly reflect some specific examples of the type of predatory lawsuits this bill will immediately stop.
>
> . . .
>
> Another example is the case of *Ileto v. Glock*, in Federal court in Los Angeles, CA, against a manufacturer and a distributor who are being sued over a criminal shooting. The facts, if you can believe it, are that the manufacturer, Glock, sold the pistol later criminally misused, to a Washington State police department and the distributor being sued never owned, sold, nor possessed the firearm that was criminally misused.

151 Cong. Rec. E2162–03 (statement of the Rep. Stearns). These sentiments echoed those of Senator Craig, the bill's sponsor in the Senate:

> I want to give some examples of exactly the type of predatory lawsuits this bill will eliminate.
>
> . . .
>
> Another example of a lawsuit captured by this bill is the case of *Ileto v. Glock*, pending in Federal court in Los Angeles, CA, against Glock and a distributor, RSR. The United States Ninth Circuit Court of Appeals said Glock and RSR could be sued for a criminal shooting when Glock sold the pistol to a Washington State police department and the distributor RSR never owned, nor sold, nor possessed the firearm.

151 Cong. Rec. E2162–03 (statement of Sen. Craig).[24]

The Court, of course, is mindful that "the remarks of a legislator, even those of the sponsoring legislator, will not override the plain meaning of a statute." *United States v. Tabacca*, 924 F.2d 906, 911 (9th Cir.1991) (citing *Weinberger v. Rossi*, 456 U.S. 25, 35 n. 15, 102 S.Ct. 1510, 71 L.Ed.2d 715 (1982) ("The contemporaneous remarks of a sponsor of legislation are not controlling in analyzing legislative history.")). However, where the sponsor's remarks comport with the statutory language and other legislative history, those remarks are entitled to consideration, as a bill's sponsor is deemed to be "particularly well informed about its purpose, meaning, and intended effect." Singer, *supra* § 48:15. Here, the statements of Representative Stearns and Senator Craig dovetail with both the statutory language and the legislative history. And while their remarks are not controlling, they never-

---

**24.** Although the district court in *Beretta* did not mention this portion of the legislative history, Representative Stearns and Senator Craig also listed the *Beretta* case as another prime example of the type of lawsuit that the PLCAA would extinguish. 151 Cong. Rec. E2162–03 (statement of the Rep. Stearns); 151 Cong. Rec. E2162–03 (statement of Sen. Craig).

theless shed light on the legislative intent on both the use of the word "applicable" in the predicate exception and whether the predicate exception was meant to apply to cases such as this one.

Although Congress did not intend to immunize firearms manufacturers and dealers from their own misconduct,[25] Congress nevertheless intended to immunize them from liability when they complied with State and Federal laws specifically governing the sale and marketing of firearms. Accordingly, Congress must also have intended to immunize them from traditional causes of action that would have imposed liability even where the manufacturers or dealers followed those laws, regardless of whether those causes of action were grounded in common law or statute or both. Indeed, the vocal opposition to, and the resounding defeats of, both the Levin Amendment and the Reed Amendment exemplify this fact.

In sum, the legislative history strongly suggests that Congress did not intend for the predicate exception to apply to viola-tions of State and Federal statutes that are merely capable of being applied to the sale and marketing of firearms. Instead, it illustrates that the predicate exception was meant to apply only to violations of State and Federal statutes specifically applicable to the sale and marketing of firearms. This interpretation not only comports with the PLCAA's legislative history, but also with its stated findings and purposes, as well as with the overall statutory scheme. *See supra.*

### b. Canons of Statutory Interpretation

In addition to the evidence cited above, traditional canons of statutory construction also buttress the Court's interpretation of the meaning of "applicable" in the predicate exception. First, the doctrine of ejusdem generis dictates that "applicable" was intended to mean "specifically applicable."[26] As mentioned earlier, the doctrine of ejusdem generis applies when general words in a statute are followed by specific words. The doctrine limits the meaning of

25. *See, e.g.,* 151 Cong. Rec. S9059–04 (statement of Sen. Craig) ("It is not a gun industry immunity bill because it does not protect firearms or ammunition manufacturers, sellers, or trade associations from any other lawsuits based on their own ·negligence or criminal conduct. This bill gives specific examples of lawsuits not prohibited-product liability, negligence or negligent entrustment, breach of contract, lawsuits based on violations of States and Federal law."); *id.* ("This legislation prohibits one narrow category of lawsuits: suits against the firearms industry for damages resulting from the criminal or unlawful misuse of a firearm or ammunition by a third party. It is very important for everybody to understand that it is that and nothing more."); 151 Cong. Rec. 9059–04 (statement of Sen. Hatch) ("This bill is not a license for the gun industry to act irresponsibly. If a manufacturer or seller does not operate entirely within Federal and State law, it is not entitled to the protection of this legislation. I should also note that this bill carefully preserves the right of individuals to have their day in court with civil liability actions where negligence is truly an issue, or where there were knowing violations of laws on gun sales."); 151 Cong. Rec. S8908–01 (statement of Sen. Sessions) ("Manufacturers and sellers are still responsible for their own negligent or criminal conduct and must operate entirely within the complex State and Federal laws. Therefore, plaintiffs are not prevented from having a day in court. Plaintiffs can go to court if the gun dealers do not follow the law, if they negligently sell the gun, if they produce a product that is improper or they sell to someone they know should not be sold to or did not follow steps to determine whether the individual was properly subject to buying a gun.").

26. The Court did not apply this doctrine earlier because the Court had not yet concluded that the word "applicable" was unclear. But having now found that "applicable" is, in fact, unclear, it is appropriate to apply this doctrine.

the general words to items that are similar to those that are thereafter specifically enumerated. Singer, *supra* § 47:17; *see Molloy v. Metro Transp. Auth.*, 94 F.3d 808, 811–12 (2d Cir.1996) (construing general term followed by "including, but not limited to," as meaning only things similar in nature to the specific items in the non-exclusive list of examples that followed).

As applied to the predicate exception, the doctrine of ejusdem generis limits the scope of the statute's general reference to State and Federal statutes "applicable" to the sale or marketing of firearms to those thereafter specified in the examples illustrating when the predicate exception would apply. Both examples involve statutes specifically applicable to the sale or marketing of firearms. Accordingly, the State and Federal statutes to which the general part of the predicate exception refers are likewise limited to statutes specifically applicable to the sale or marketing of firearms.

Second, as a general rule, exceptions in a statute should be read narrowly. *Korherr v. Bumb*, 262 F.2d 157, 162 (9th Cir.1958) ("[W]here words of exception are used, they are to be strictly construed to limit the exception.") (citing *Piedmont & Northern R. Co. v. Interstate Commerce Commission*, 286 U.S. 299, 52 S.Ct. 541, 76 L.Ed. 1115 (1932)); *E.E.O.C. v. Kamehameha Schools/Bishop Estate*, 990 F.2d 458,

460 (9th Cir.1993) ("We construe the statutory exemptions narrowly."). Construing the predicate exception to apply to a violation of any State or Federal statute capable of being applied to the firearms industry would turn this canon on its head. Indeed, as discussed earlier, this interpretation would create such a large exception that the immunity that the PLCAA provides would be largely eviscerated. Accordingly, like the doctrine of ejusdem generis, the general rule favoring strict interpretation of exceptions likewise counsels in favor of limiting the predicate exception to violations of statutes specifically applicable to the sale or marketing of firearms.

4. **Plaintiffs' Causes of Action Are Based Exclusively on State Statutes That Are Only Generally Applicable to the Sale and Marketing of Firearms.**

■ The Court now turns to whether Plaintiffs' causes of action fall within the predicate exception. Plaintiffs rely on three State statutes that allegedly bring their causes of action within the predicate exception. Specifically, Plaintiffs rely on the following statutes: (1) California Civil Code section 1714(a),[27] which establishes a general duty of care by which all in California must abide; (2) California Civil

---

**27.** Section 1714(a), as effective when this action was filed, stated:

> Every one is responsible, not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself. The extent of liability in such cases is defined by the Title on Compensatory Relief.

Cal. Civil Code § 1714(a) (2001). Section 1714(a) was amended in 2002 to note that the firearms industry was not exempt from the general duty imposed by section 1714(a). As

amended, section 1714(a) reads, in pertinent part, as follows:

> Everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself or herself. The design, distribution, or marketing of firearms and ammunition is not exempt from the duty to use ordinary care and skill that is required by this section.

Cal. Civil Code § 1714(a) (2004).

Code section 3479,[28] which embodies California's definition of a nuisance; and (3) California Civil Code section 3480,[29] which sets forth what constitutes a public nuisance.

None of these statutory provisions, however, triggers the predicate exception. On the contrary, each of these statutory provisions apply only generally: they are not statutes specifically applicable to the sale or marketing of firearms. As such, under the Court's interpretation of the predicate exception, none of them constitutes a statute "applicable" to the sale or marketing of firearms. Moreover, the 2002 amendment to section 1714(a) does not effect the Court's conclusion. *See infra* at n. 27. Even assuming that this amendment applied to this action, which predated the amendment, the amendment nevertheless does not change the character of section 1714(a).[30] It was and still is a statute of general applicability. Indeed, to the ex-

tent that the amended version of section 1714(a) mentions the firearms industry, it does so only to show that the duty of care described in the statute was meant to apply to everyone in California, even the firearms industry. As such, it is no more specifically applicable to sale or marketing of firearms than the general definitions of nuisance and public nuisance on which Plaintiffs also rely. Accordingly, even as amended, section 1714(a) does not trigger the predicate exception.

Because Plaintiffs cite no other statutory provision to maintain any of their causes of action, the PLCAA requires the immediate dismissal of this action.

## B. The PLCAA is Constitutional.

Plaintiffs challenge the constitutionality of the PLCAA, at least as applied to them, on several grounds, most of which hinge upon Plaintiffs' assertion that their causes of action against Defendants constitute vested property rights.[31] For example,

**28.** Section 3479 states:

Anything which is injurious to health, including, but not limited to, the illegal sale of controlled substances, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway, is a nuisance.

Cal. Civil Code § 3479.

**29.** Section 3480 states:

A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal.

Cal. Civil Code § 3480.

**30.** Defendants contend that the 2002 amendment to section 1714(a) should not apply to this case because the case predates the amendment. Under California law, as under federal law, statutes do not operate retrospectively unless the legislature plainly intended

them to do so. *W. Sec. Bank v.Super. Ct.*, 15 Cal.4th 232, 243, 62 Cal.Rptr.2d 243, 933 P.2d 507 (1997) (*citing Evangelatos v.Super. Ct.*, 44 Cal.3d 1188, 1207–08, 246 Cal.Rptr. 629, 753 P.2d 585 (1988)). "The presumption against retroactive legislation is 'deeply rooted in our jurisprudence' because 'individuals should have an opportunity to know what the law is and to conform their conduct accordingly.'" *Valles v. Ivy Hill Corp.*, 410 F.3d 1071, 1079 (9th Cir.2005) (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)). "However, 'a statute that merely clarifies, rather than changes, existing law' may be 'applied to transactions predating its enactment.'" *Valles*, 410 F.3d at 1079 (quoting *W. Sec. Bank*, 15 Cal.4th at 243, 62 Cal.Rptr.2d 243, 933 P.2d 507) (some citations omitted). Here, section 1714(a) arguably only clarifies existing California law. However, the Court need not resolve this issue because, as discussed above, the amended version of section 1714(a) does not implicate the predicate exception.

**31.** *See, e.g.*, Opposition at 25 ("[U]nder controlling state law, these Plaintiffs' personal

Plaintiffs claim that the PLCAA effectuates a taking of their property without compensation. Additionally, they assert that the retroactive provision of the PLCAA denies them their rights to due process. Furthermore, they claim that the PLCAA amounts to a bill of attainder. Finally, they contend that the PLCAA violates their rights to equal protection.

As explained below, none of these arguments has merit. Rather, as applied to Plaintiffs, the PLCAA passes constitutional muster. The Court addresses each of Plaintiffs' constitutional challenges in turn below.

### 1. Vested Property Right

As the majority of Plaintiffs' constitutional challenges rise or fall depending on whether Plaintiffs have a vested property interest in their causes of action, the Court turns first to this question. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982) (stating that threshold question in due process claim is whether plaintiff was deprived of a protected interest and, if so, what process was due).

■ Plaintiffs contend that the express retroactivity of the PLCAA amounts to an unconstitutional taking of their property interests in this lawsuit. Specifically, they assert that their causes of action against Glock and RSR constitute vested property interests that cannot be taken without just compensation or due process of law.

■ A cause of action is a "species of property." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982). While recognizing

this principle, the Ninth Circuit has nevertheless held that a party's property right in any cause of action does not vest " 'until a final unreviewable judgment is obtained.' " *In re Consolidated U.S. Atmospheric Testing Litigation*, 820 F.2d 982, 989 (9th Cir.1987) (quoting *Hammond v. United States*, 786 F.2d 8, 12 (1st Cir. 1986)); *Grimesy v. Huff*, 876 F.2d 738, 743–44 (9th Cir.1989).

Additionally, every circuit court to have addressed the issue has likewise concluded that no vested property right exists in a cause of action unless the plaintiff has obtained a final, unreviewable judgment. *See, e.g., Hammond*, 786 F.2d at 12 ("Because rights in tort do not vest until there is a final, unreviewable judgment, Congress abridged no vested rights of the plaintiff by enacting § 2212 and retroactively abolishing her cause of action in tort.") (cited with approval by the Ninth Circuit in *Atmospheric Testing*, 820 F.2d at 989); *Sowell v. American Cyanamid Co.*, 888 F.2d 802, 805 (11th Cir.1989) ("The fact that the statute is retroactive does not make it unconstitutional as a legal claim affords no definite or enforcible [sic] property right until reduced to final judgment."); *Arbour v. Jenkins*, 903 F.2d 416, 420 (6th Cir.1990) (same) (quoting *Sowell*, 888 F.2d at 805); *Eddings v. Volkswagenwerk, A.G.*, 835 F.2d 1369, 1373 (11th Cir. 1988) (finding no Fourteenth Amendment violation in the retroactive application of a twelve year statute of repose that barred the plaintiffs' cause of action); *Ducharme v. Merrill–Nat'l Laboratories*, 574 F.2d 1307, 1309 (5th Cir.1978) ("[A] plaintiff has no vested right in any tort claim for damages under state law.")

injury and wrongful death claims are vested property rights, and thus they are entitled to the procedural and substantive protections of the Due Process Clause. Prior to the enactment of the Act, state law also entitled Plaintiffs to access to the courts and a right to a jury trial on disputed factual issues, both of

which were attributes of their vested state law claims"); *id.* at 28 ("Moreover, as an attribute of Plaintiffs' vested property rights, prior to the Act they were entitled to access to the courts and to a jury trial on disputed factual issues. The Act severely impacts these fundamental rights.").

Here, Plaintiffs have no vested property right in their causes of action because they have never obtained a final, unreviewable judgment in their favor. Accordingly, applying the PLCAA's retroactive provision to Plaintiffs' causes of action does not constitute a taking under the Fifth Amendment.

### 2. Procedural Due Process

Plaintiffs also contend that the retroactive provision of the statute violates their right to due process because it effectively requires dismissal of their action without first affording them a meaningful opportunity to be heard. Due process is flexible and calls for such procedural protections as the particular situation demands. *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Generally, due process requires, at the least, some type of notice and an opportunity to be heard. *Foss v. National Marine Fisheries Serv.*, 161 F.3d 584, 590 (9th Cir. 1998).

■■ Although a cause of action is a "species of a protected property," it nevertheless differs substantially from real or personal property or vested intangible rights. *Atmospheric Testing*, 820 F.2d at 989. "It is inchoate and affords no definite or enforceable property right until reduced to final judgment." *Id.* As such, it affords the holder fewer rights than the traditional bundle of rights associated with the ownership of property. *Id.* "Instead, it represents a right to assert a claim for compensation or some other form of judicial relief.

Its value is contingent on successful prosecution to judgment. Thus, to the extent it is entitled to due process protection, that protection focuses on assuring access to fair procedures for its prosecution. The notion of due process relevant to causes of action is that deprivation ... by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Id.*

The PLCAA affords Plaintiffs all process due to them considering the interest they have in their causes of action. Contrary to Plaintiffs' arguments, the PLCAA does not require the dismissal of any pending case against a firearms manufacturer or dealer without any judicial oversight. Rather, it requires only that cases fitting the Act's definition of a "qualified civil liability action" be dismissed. And before any case fitting that definition is dismissed, a plaintiff receives notice of the possibility of dismissal and an opportunity to argue that the given case falls within one of the exceptions to the definition of a "qualified civil liability action." Indeed, as the *Beretta* Court pointed out, the Act "does not control courts' determinations" of whether one of the Act's exceptions to dismissal applies. *Beretta*, 401 F.Supp.2d at 293. Instead, this determination rests in the sole province of the courts. *See id.* Finally, before any dismissal occurs, a plaintiff can challenge the constitutionality of the Act, as Plaintiffs have done in this case. Thus, Plaintiffs' contention that the Act requires "immediate dismissal of [their] lawsuit without a meaningful opportunity" to be heard is meritless.[32]

**32.** Indeed, the Court devoted a very considerable amount of time and energy to determining whether, in fact, this case fell within the predicate exception to the PLCAA's definition of a "qualified civil immunity action." The Court determined that it did not fall within that exception only after carefully considering and weighing the arguments of counsel, researching and analyzing relevant case law,

and reviewing every piece of legislative history related to the PLCAA. Additionally, the Court spent an equal amount of time—if not more—addressing the merits of Plaintiffs' many and oftentimes confusing constitutional arguments. Thus, the Court is somewhat puzzled by Plaintiffs' assertion that they have received "no meaningful opportunity" to be heard. The Court treats all the matters that

### 3. Retroactivity

 As a general rule, courts hold a strong presumption against retroactive legislation. *Aragon–Ayon v. I.N.S.*, 206 F.3d 847, 851 (9th Cir.2000) (citing *Hughes Aircraft Co. v. United States*, 520 U.S. 939, 946, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997)). "However, this presumption is applied only if Congress has not 'clearly manifested its intent to the contrary.'" *Id.* (quoting *Hughes Aircraft Co.*, 520 U.S. at 946, 117 S.Ct. 1871). If, on the other hand, Congress clearly manifests its intent for the given legislation to apply retroactively, the Court limits its inquiry to whether the given legislation meets the requirements of due process. *See Atmospheric Testing*, 820 F.2d at 991.

 To meet the requirements of due process, "the retroactive application of [the] statute must be supported by a legitimate legislative purpose furthered by rational means."[33] *Id.; SeaRiver Maritime Financial Holdings, Inc. v. Mineta*, 309 F.3d 662, 678 (9th Cir.2002) (stating that analysis of legislation intended to apply retroactively requires court to determine "whether the statute is justified by a rational legislative purpose"); *Landgraf v. USI Film Prods.*, 511 U.S. 244, 266, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (explaining that legislation comports with the Due Process Clause if "the retroactive application of the legislation is itself justified by a rational legislative purpose"). The party challenging the retroactive application of the statute bears the burden of establishing that "'the legislature has acted in a arbitrary and irrational way.'" *Atmospheric Testing*, 820 F.2d at 991–92 (quoting *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976)).

 Here, the PLCAA's retroactive provision comports with due process. First, Congress unequivocally manifested its intent for the PLCAA to apply retroactively. Indeed, the Act requires the dismissal of any "qualified" action "pending" as of the date of the Act's enactment. 15 U.S.C. § 7902(b). As this necessarily requires the dismissal of actions filed before the statute's enactment, Congress could not have made its intent for the statute to apply retroactively any clearer.

Second, the retroactive application of the Act furthers a legitimate legislative purpose. Among other things, the Act seeks to prevent a perceived undue burden on interstate commerce caused by what Congress has determined to be "predatory" lawsuits against the firearms industry. *See* 15 U.S.C. § 7901(b)(4); *see also Beretta*, 401 F.Supp.2d at 295 (finding that Congress's desire to insulate firearms manufacturers and dealers from threat of qualified civil liability actions provided ra-

---

come before it—particularly those challenging legislation of national significance—very seriously.

**33.** Plaintiffs urge the Court to apply a heightened standard of review because the PLCAA affects a fundamental right—namely, their Seventh Amendment right to access the courts and to jury trial. Plaintiffs, however, premise this argument on the existence of a vested property right in their causes of action against Defendants. *See* Opposition at 25 ("Prior to the enactment of the Act, state law also entitled Plaintiffs to access to the courts and a right to a jury trial on disputed factual issues, *both of which were attributes of their vested state law claims.*"); *id.* ("Moreover, *as an attribute of Plaintiffs' vested property rights,* prior to the Act they were entitled to access to the courts and to a jury trial on disputed factual issues.") (emphasis added). But as explained in detail above, Plaintiffs have no vested property right in their causes of action. Accordingly, the Court declines to apply a heightened standard of review to Plaintiffs' challenge to the retroactive provision of the PLCAA. Likewise, the Court declines to apply a heightened standard of review to Plaintiffs' equal protection challenges to the PLCAA.

tional basis for enacting the PLCAA). The legislative history contains repeated references about the dire consequences of these "predatory" lawsuits.[34] Although one may disagree with Congress's predictions, one cannot credibly argue that the Act's retroactive provision does not further a legitimate legislative purpose. *See Beretta*, 401 F.Supp.2d at 295 (rejecting equal protection challenge to PLCAA and stating that " 'rational basis does not allow courts to judge wisdom or desirability of legislative policy determinations' ") (quoting *Heller v. Doe*, 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993)). On the contrary, preventing undue burdens on interstate commerce falls squarely within Congress's authority under the commerce clause. *See Gonzales v. Raich*, 545 U.S. 1, 125 S.Ct. 2195, 2205, 162 L.Ed.2d 1 (2005) ("Congress has the power to regulate activities that substantially affect interstate commerce."). Moreover, as the district court in *Beretta* has already concluded, "there is a rational basis for Congress' determination that the Act was necessary to protect [the firearms] industry." *Beretta*, 401 F.Supp.2d at 287.

In short, the retroactive provision of the PLCAA as applied to Plaintiffs comports with the Due Process Clause of the Fifth Amendment.

### 4. Bill of Attainder

Plaintiffs next assert that the PLCAA amounts to a bill of attainder, in that it targets a small, readily identifiable number of parties, each of whom has an action pending against members of the firearms industry. Plaintiffs presumably believe that Congress enacted the PLCAA to punish those parties for prosecuting these actions. Indeed, Plaintiffs note that the congressional record shows that some of the legislators even named the parties they sought to target with the PLCAA. As such, Plaintiffs conclude that the PLCAA violates the constitutional prohibition on bill of attainders.

"[L]egislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial are bills of attainder prohibited by the Constitution." *U.S. v. Munsterman*, 177 F.3d 1139, 1141 (9th Cir.1999) (internal quotations and citations omitted). "Three requirements must be met to establish a violation of the bill of attainder clause: '[S]pecification of the affected persons, punishment, and lack of a judicial trial.' " *Id.* (quoting *Selective Serv. Sys. v. Minnesota Pub. Interest Research Group*,

---

**34.** *See, e.g.,* 151 Cong. Rec. S8908–01 (statement of Sen. Sessions) ("These industries have great reason to be insecure. Everyone knows how detrimental runaway verdicts can be and one major verdict can bankrupt an industry. Huge costs arise from simply defending an unjust lawsuit. Indeed, such lawsuits, even if lacking any merit and ultimately unsuccessful, can deplete an industry's resources and depress stock prices."); 151 Cong. Rec. S9059–04 (statement of Sen. Coburn) ("The danger that these lawsuits could destroy the gun industry is especially threatening because our national security and our civil liberties are at stake."); 151 Cong. Rec. S8927–01 (statement of Sen. Hatch) ("Now, this legislation is a necessary response to the growing problem of junk lawsuits filed, no doubt, in part with the intention of driving the firearms industry out of business."); 151 Cong. Rec. H8881–01 (statements of Rep. Gingrey) ("The passage of this legislation is time-sensitive. Every day without this legislation puts more stress on firearm manufacturers, their customers, and their employees. Indeed, some lawsuits are motivated by ideology and a distaste for the firearm industry and guns in general. They will simply keep suing until either the firearm companies are out of business or the guns are too expensive to purchase.").

468 U.S. 841, 847, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984)).

In analyzing the "punishment" element, a court looks to three factors to determine whether the challenged act imposes a "punishment" for bill of attainder purposes. First, the court determines whether the challenged legislative act "falls within the historical meaning of legislative punishment." *Nixon v. Administrator of General Services*, 433 U.S. 425, 475, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977). Second, the court determines whether "the law under challenge, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes." *Id.* Third, the court determines whether the legislative record demonstrates a "Congressional intent to punish." *Id.* at 478, 97 S.Ct. 2777.

Here, the PLCAA is not a bill of attainder because no evidence suggests that its purpose is to punish. First, the Act does not fall within the historical meaning of legislative punishment. Although confiscation of property can establish the requisite "punishment," Plaintiffs had no vested property interest in their lawsuit. *See supra.* Second, the PLCAA furthers only "non-punitive legislative purposes"—namely, preventing undue burdens to interstate commerce by protecting the firearms industry from the threat of bankruptcy. Third, the legislative record suggests no Congressional intent to punish anyone, let alone Plaintiffs specifically. Instead, the legislative intent evidences an intent to shield firearms manufacturers and dealers who legally make and sell firearms from liability for injuries caused by a third party using their products. As such, the PLCAA is not a bill of attainder.

### 5. Equal Protection

Finally, Plaintiffs claim that the PLCAA violates their rights to equal protection under the Fifth Amendment, although Plaintiffs never specifically articulate the alleged violation. Indeed, Plaintiffs never explain how the Act treats them differently from any other group of people, except perhaps that it requires the dismissal of Plaintiffs' pending action, but only bars future qualified actions. If this serves as the basis of Plaintiffs' equal protection claim, it fails for the reasons explained below.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Although the Fifth Amendment does not contain an equal protection clause, the Due Process Clause of the Fifth Amendment embodies an equal protection component that applies to the federal government. *United States v. Sperry Corp.*, 493 U.S. 52, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989) (discussing "the equal protection component of the Due Process Clause" in reviewing the constitutionality of a federal statute).

The Court applies the deferential rational basis standard of review to the PLCAA because Plaintiffs have failed to identify either a fundamental right or a suspect class affected by the PLCAA's application. *See supra* at n. 33. Under the rational basis standard, the Court must engage in a two-tiered inquiry. First, it must determine whether the challenged law has a legitimate purpose. *See Jackson Water Works, Inc. v. Public Util., Comm'n of Cal.*, 793 F.2d 1090, 1094 (9th Cir.1986). Second, the Court must decide whether the challenged law promotes that purpose. *Id.* In this regard, the challenged law will be upheld so long as there is a rational

relationship between the ends of the law and the means used to achieve those ends. *Aleman v. Glickman,* 217 F.3d 1191, 1200 (9th Cir.2000). Accordingly, the challenged law "must be upheld if there is any reasonably conceivable set of facts that could provide a rational basis for the classification." *Taylor v. Rancho Santa Barbara,* 206 F.3d 932, 935 (9th Cir.2000). Moreover, in making this determination, the Court does not second-guess Congress's motivations. *Besinga v. United States,* 14 F.3d 1356, 1362 (9th Cir.1994).

Here, to the extent that the Act distinguishes between Plaintiffs and those who do not have a claim pending, it nevertheless does not violate Plaintiffs' rights to equal protection. First, as explained above regarding Plaintiffs' challenge to the Act's retroactivity provision, the PLCAA serves a legitimate purpose. Specifically, it seeks to, among other things, eliminate a perceived undue burden on interstate commerce caused by certain lawsuits threatening the economic viability of the firearms industry. *See Beretta,* 401 F.Supp.2d at 295 (rejecting equal protection challenge to PLCAA and noting that "Congress made it clear that it thought that nationwide commerce in firearms was particularly imperiled by the threat of qualified civil actions"). Preventing undue burdens on interstate commerce is a legitimate purpose, as is protecting the firearms industry from financial ruin.

Second, the provision of the PLCAA requiring the immediate dismissal of all pending qualified civil liability actions is rationally related to the purpose behind the law. One of the stated purposes of the PLCAA is to protect the firearms industry from lawsuits seeking to hold the industry responsible for the acts of others. *See* 15 U.S.C. § 7901(b)(1).[35] This purpose is furthered by immunizing firearms manufacturers and dealers from qualified civil liability actions and, as such, provides a rational basis between the goals of the Act and the means used to achieve those goals.[36]

### CONCLUSION

For the reasons stated above, Defendants' Motion for Judgment on the Pleadings is GRANTED. Accordingly, the Court DISMISSES this matter as to Defendants Glock and RSR with prejudice.

---

**35.** Section 7901(b)(1) states:
> The purposes of this chapter are ... to prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms or ammunition products, and their trade associations, for the harm solely caused by the criminal or unlawful misuse of firearm products or ammunition products by others when the product functioned as designed and intended.

15 U.S.C. § 7901(b)(1).

**36.** It is not the Court's role to consider the wisdom of the legislature's decision to grant this limited immunity to the firearms industry. Instead, the Court has confined its analysis to whether Congress acted within its constitutional authority and whether the resulting legislation passes constitutional muster. The Court answers both questions in the affirmative.