# SUPREME COURT OF THE STATE OF NEW YORK
## *Appellate Division, Fourth Judicial Department*

**938**

**CA 11-02092**

PRESENT: CENTRA, J.P., PERADOTTO, CARNI, LINDLEY, AND SCONIERS, JJ.

---

DANIEL WILLIAMS AND EDWARD WILLIAMS,
PLAINTIFFS-APPELLANTS,

V                                            OPINION AND ORDER

BEEMILLER, INC., DOING BUSINESS AS HI-POINT,
CHARLES BROWN, MKS SUPPLY, INC.,
DEFENDANTS-RESPONDENTS,
ET AL., DEFENDANTS,
AND THE UNITED STATES, RESPONDENT.
(APPEAL NO. 1.)

---

CONNORS & VILARDO, LLP, BUFFALO, AND BRADY CENTER TO PREVENT GUN
VIOLENCE, WASHINGTON, D.C. (JONATHAN E. LOWY, OF THE WASHINGTON, D.C.
BAR, ADMITTED PRO HAC VICE, OF COUNSEL), FOR PLAINTIFFS-APPELLANTS.

RENZULLI LAW FIRM, LLP, WHITE PLAINS (SCOTT C. ALLAN OF COUNSEL), FOR
DEFENDANT-RESPONDENT BEEMILLER, INC., DOING BUSINESS AS HI-POINT.

SCOTT L. BRAUM & ASSOCIATES, LTD., DAYTON, OHIO (SCOTT L. BRAUM, OF
THE OHIO BAR, ADMITTED PRO HAC VICE, OF COUNSEL), AND DAMON MOREY LLP,
BUFFALO, FOR DEFENDANT-RESPONDENT CHARLES BROWN.

PISCIOTTI, MALSCH & BUCKLEY, P.C., WHITE PLAINS (JEFFREY M. MALSCH OF
COUNSEL), FOR DEFENDANT-RESPONDENT MKS SUPPLY, INC.

WILLIAM J. HOCHUL, JR., UNITED STATES ATTORNEY, WASHINGTON, D.C.
(BENJAMIN S. KINGSLEY OF COUNSEL), FOR RESPONDENT.

---

Appeal from an order of the Supreme Court, Erie County (Frederick
J. Marshall, J.), entered May 18, 2011. The order granted the motions
of defendants Beemiller, Inc., doing business as Hi-Point, Charles
Brown and MKS Supply, Inc. to dismiss the first amended complaint.

It is hereby ORDERED that the order so appealed from is
unanimously reversed on the law without costs, the motions are denied,
and the first amended complaint is reinstated against defendants
Beemiller, Inc., doing business as Hi-Point, Charles Brown and MKS
Supply, Inc.

Opinion by PERADOTTO, J.: Plaintiffs commenced this action
seeking damages for injuries sustained by Daniel Williams (plaintiff)
in an August 2003 shooting in the City of Buffalo. Plaintiff, a high
school student, was shot in the abdomen by defendant Cornell Caldwell,

who apparently misidentified plaintiff as a rival gang member.  The gun used to shoot plaintiff was identified as a Hi-Point 9mm semi-automatic pistol manufactured by defendant Beemiller, Inc., doing business as Hi-Point (Beemiller), an Ohio corporation and a federally licensed firearms manufacturer.  Beemiller sold the gun to defendant MKS Supply, Inc. (MKS), an Ohio corporation and a federally licensed wholesale distributor of firearms.  MKS then sold the gun to defendant Charles Brown, a federal firearms licensee in Ohio.  In October 2000, Brown sold 87 handguns, including the gun at issue, to defendants Kimberly Upshaw and James Nigel Bostic at a gun show in Ohio. Plaintiffs allege that Bostic, a Buffalo resident, was engaged in a trafficking scheme whereby he traveled to Ohio, a state with comparatively less stringent gun control laws than New York, and used "straw purchasers" to obtain large numbers of handguns.  Bostic then supplied those guns, including the gun used to shoot plaintiff, to the criminal market in New York.

In the first amended complaint (hereafter, complaint), plaintiffs allege, inter alia, that Beemiller, MKS, and Brown (collectively, defendants) "negligently distributed and sold the Hi-Point handgun in a manner that caused it to be obtained by Caldwell, an illegal and malicious gun user and possessor, and then to be used to shoot [plaintiff]."  According to plaintiffs, Beemiller and MKS intentionally supplied handguns to irresponsible dealers, including Brown, because they profited from sales to the criminal gun market. Brown, in turn, sold numerous handguns, including the subject gun, to Bostic and Upshaw, even though he knew or should have known that they "intended to sell these multiple guns on the criminal handgun market, to supply prohibited persons and criminals such as Caldwell with handguns."  The complaint contains six causes of action.  The first five causes of action allege that defendants (1) negligently distributed and sold the gun at issue to individuals they knew or should have known were in the business of illegally distributing handguns; (2) negligently entrusted the gun to individuals they knew or should have known would create an unreasonable risk of physical injury to others; (3) committed negligence per se by violating various federal and state gun laws; (4) created a public nuisance by distributing a large number of guns into the illegal gun market and selling them to that market; and (5) intentionally violated federal, state, and local legislative enactments.  The sixth cause of action is derivative in nature.

In lieu of answering the complaint, defendants each moved to dismiss the complaint pursuant to the Protection of Lawful Commerce in Arms Act (PLCAA or Act) (15 USC §§ 7901-7903, as added by Pub L 109-92, 119 US Stat 2095).  Plaintiffs opposed the motions, contending, inter alia, that the PLCAA was inapplicable or, in the alternative, that the statute was unconstitutional.  In appeal No. 1, plaintiffs appeal from an order granting defendants' motions and dismissing the complaint against them.  In appeal No. 2, plaintiffs appeal from an order denying their motion for leave to renew and reargue their opposition to defendants' motions to dismiss.

I

We conclude at the outset with respect to appeal No. 2 that the appeal from the order therein must be dismissed.  In support of that part of the motion seeking leave to renew, plaintiffs failed to offer new facts that were unavailable at the time of their prior motion (*see Hill v Milan*, 89 AD3d 1458, 1458).  Thus, plaintiffs' motion was actually only one seeking leave to reargue, and no appeal lies from an order denying a motion for leave to reargue (*see id.*; *Empire Ins. Co. v Food City*, 167 AD2d 983, 984).

II

With respect to appeal No. 1, we agree with plaintiffs that Supreme Court erred in dismissing the complaint pursuant to the PLCAA. The PLCAA, which went into effect on October 26, 2005, generally shields manufacturers and sellers of firearms from liability for harm caused by the criminal or unlawful misuse of their non-defective products, i.e., products that functioned as designed and intended (*see* 15 USC §§ 7901 [b] [1]; 7903 [5] [A]; *Ileto v Glock, Inc.*, 565 F3d 1126, 1129, *cert denied* ___ US ___, 130 S Ct 3320).  To that end, the Act prohibits the institution of a "qualified civil liability action" in any state or federal court (§ 7902 [a]), and mandates that any such action pending on the effective date of the PLCAA "shall be immediately dismissed" (§ 7902 [b]; *see Ileto*, 421 F Supp 2d 1274, 1284, *affd* 565 F3d 1126, *cert denied* ___ US ___, 130 S Ct 3320; *City of New York v Beretta U.S.A. Corp.*, 524 F3d 384, 389, *cert denied* ___ US ___, 129 S Ct 1579; *Estate of Charlot v Bushmaster Firearms, Inc.*, 628 F Supp 2d 174, 180).  A "qualified civil liability action" is defined, in relevant part, as "a civil action . . . brought by any person against a manufacturer or seller of a qualified product . . . for damages . . . or other relief[] resulting from the criminal or unlawful misuse of a qualified product by the person or a third party" (§ 7903 [5] [A]).  A "qualified product" includes "a firearm . . . shipped or transported in interstate or foreign commerce" (§ 7903 [4]).

Here, it is undisputed that this matter falls within the PLCAA's general definition of a "qualified civil liability action" (15 USC § 7903 [5] [A]).  The present suit is a "civil action" brought by a "person" (plaintiffs) against a "manufacturer" (Beemiller) or "seller" (MKS/Brown) of a "qualified product" (the handgun) seeking "damages . . . or other relief" resulting from the "criminal . . . misuse of [the handgun] by . . . a third party" (Caldwell) (*id.*; *see Ileto*, 565 F3d at 1131-1132; *Ryan v Hughes-Ortiz*, 81 Mass App Ct 90, 98, 959 NE2d 1000, 1007).  The question thus becomes whether any of the statute's six exceptions to the definition of "qualified civil liability action" apply to this action (*see* § 7903 [5] [A] [i] - [vi]; *Ileto*, 421 F Supp 2d at 1283-1284; *Ryan*, 81 Mass App Ct at 98, 959 NE2d at 1007).

Of particular relevance here, a "qualified civil liability action" does not include "an action in which a manufacturer or seller of a qualified product *knowingly violated a State or Federal statute applicable to the sale or marketing of the product*, and the violation

was a proximate cause of the harm for which relief is sought" (15 USC § 7903 [5] [A] [iii] [emphasis added]). That exception is often referred to as the " 'predicate exception,' because a plaintiff not only must present a cognizable claim, [but] he or she also must allege a knowing violation of a 'predicate statute,' " i.e., a state or federal statute applicable to the sale or marketing of firearms (*Ileto*, 565 F3d at 1132; *see District of Columbia v Beretta U.S.A. Corp.*, 940 A2d 163, 168, *cert denied* ___ US ___, 129 S Ct 1579; *Smith & Wesson Corp. v City of Gary*, 875 NE2d 422, 429-430 [Ind]). The PLCAA also contains an exception for claims against a seller of firearms for negligent entrustment or negligence per se (§ 7903 [5] [A] [ii]; *see Ileto*, 565 F3d at 1136 n 6).

It is well established that, "[w]hen reviewing 'a motion to dismiss pursuant to CPLR 3211, we must accept as true the facts as alleged in the complaint and submissions in opposition to the motion, accord plaintiffs the benefit of every possible favorable inference and determine only whether the facts as alleged fit within any cognizable legal theory' " (*10 Ellicott Sq. Ct. Corp. v Violet Realty, Inc.*, 81 AD3d 1366, 1367, *lv denied* 17 NY3d 704, quoting *Sokoloff v Harriman Estates Dev. Corp.*, 96 NY2d 409, 414; *see Leon v Martinez*, 84 NY2d 83, 87-88). Applying that standard, we agree with plaintiffs that the court erred in dismissing the complaint inasmuch as they sufficiently alleged that defendants knowingly violated various federal and state statutes applicable to the sale or marketing of firearms within the meaning of the PLCAA's predicate exception (*see* 15 USC § 7903 [5] [A] [iii]; *City of New York v A-1 Jewelry & Pawn, Inc.*, 247 FRD 296, 351).

The complaint alleges, inter alia, that defendants "violated federal, state, and local statutes, regulations, and ordinances by engaging in illegal gun trafficking and illegally selling the Hi-Point handgun." With respect to Brown specifically, the complaint alleges that he "violated federal, state, and local statutes, regulations, and ordinances[] by selling firearms with a federal firearms license registered to his home address, by selling firearms with a federal firearms license solely at gun shows, and by selling firearms to Upshaw, who was purchasing firearms on Bostic's behalf, when Brown knew or had reasonable cause to believe that Bostic was ineligible to purchase a weapon." Initially, we reject defendants' contention that the complaint was properly dismissed because plaintiffs failed to identify the federal statutes that defendants allegedly violated. Defendants rely on cases involving the specific pleading requirements imposed in actions pursuant to General Municipal Law § 205-e (*see Mackay v Misrok*, 215 AD2d 734, 735; *Maisch v City of New York*, 181 AD2d 467, 469). Defendants, however, cite no cases applying that rule outside the General Municipal Law context and, indeed, in *Cole v O'Tooles of Utica* (222 AD2d 88, 91), we stated that the cases arising under the General Municipal Law "do not stand for the general proposition . . . that a plaintiff must always specify a statute in order to state a statutory cause of action." In any event, even assuming, arguendo, that the complaint lacks the requisite specificity, we note that defendants' remedy for that alleged defect

is to serve a demand for a bill of particulars, not to move for dismissal of the complaint (*see generally* CPLR 3041, 3043; *Sacks v Town of Thompson*, 33 AD2d 627, 628).

We conclude that, although the complaint does not specify the statutes allegedly violated, it sufficiently alleges facts supporting a finding that defendants knowingly violated federal gun laws.  For example, the Gun Control Act of 1968 (18 USC § 921 *et seq.*) requires licensed firearms dealers to keep records containing information about the identity of individuals who purchase firearms (*see* § 923 [g]; *United States v Nelson*, 221 F3d 1206, 1209, *cert denied* 531 US 951).  At a minimum, the records must contain "the name, age, and place of residence" of any person who purchases a firearm from a licensed dealer (§ 922 [b] [5]; *see Nelson*, 221 F3d at 1209).  Further, "the information required [by 18 USC § 922] is information about the identity of the *actual buyer*, who supplies the money and intends to possess the firearm, as opposed to that individual's 'straw [purchaser]' or agent" (*Nelson*, 221 F3d at 1209 [emphasis added]).  To that end, Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) Form 4473, which must be completed when a licensed dealer transfers a firearm to anyone other than another licensee (*see* 27 CFR § 478.124 [a]; *United States v Carney*, 387 F3d 436, 442 n 3), specifically asks the purchaser whether he or she is "the actual transferee/buyer of the firearm(s) listed on th[e] form" (www.atf.gov/forms/download/atf-f-4473-1.pdf; *see Nelson*, 221 F3d at 1208-1209).  "A dealer violates the [Gun Control Act] if the dealer transfers a firearm based upon information in ATF Form 4473 that he [or she] knows or has reason to believe is false" (*Shawano Gun & Loan, LLC v Hughes*, 650 F3d 1070, 1073; *see* 18 USC § 922 [m]).  Further, a licensed dealer may be criminally liable for aiding and abetting a gun purchaser's making of false statements or representations in the dealer's firearms transfer records (*see Carney*, 387 F3d at 441, 445-446; *see generally* § 2 [a]).

Here, plaintiffs allege that Upshaw engaged in illegal straw purchases on behalf of Bostic with the knowledge and assistance of Brown, a federally licensed firearms dealer.  Specifically, plaintiffs allege that, on at least four different occasions, Brown sold guns to Bostic, a "convicted felon" who was prohibited from purchasing firearms (*see* 18 USC § 922 [d] [1]), via straw purchases to Upshaw.  According to plaintiffs, Bostic selected and paid for the handguns while Upshaw filled out the required paperwork as the purchaser of record, circumstances that are suggestive of a prohibited straw purchase (*see Carney*, 387 F3d at 442; *Nelson*, 221 F3d at 1208).  Brown allegedly sold at least 140 handguns to Bostic and/or Upshaw in this manner.  In October 2000, Brown allegedly sold Bostic and/or Upshaw 87 handguns, including the gun used to shoot plaintiff, at a gun show in Ohio.  According to plaintiffs, Brown knew or should have known that Upshaw and/or Bostic were purchasing the 87 handguns for trafficking in the criminal market rather than for their personal use because (1) they had purchased multiple guns on prior occasions; (2) they paid for the guns in cash; and (3) they selected Hi-Point 9mm handguns, which are "disproportionately used in crime" and have "no collector value or interest."

With respect to Beemiller and MKS, we conclude that the complaint sufficiently alleges that those entities were accomplices to Brown's statutory violations (*see generally Carney*, 387 F3d at 446-447). Plaintiffs allege that Beemiller and MKS supplied handguns to Brown even though they knew or should have known that he was distributing those guns to unlawful purchasers for trafficking into the criminal market.  In support thereof, plaintiffs allege, inter alia, that from 1988 through 2000, ATF notified Beemiller and MKS that over 13,000 guns they sold had been used in crimes.  Notably, MKS is allegedly the "sole marketer and distributor of Hi-Point firearms," and Brown, who is now the president of MKS, was a high-level officer during the relevant time period.

III

In light of our conclusion that this action falls within the PLCAA's predicate exception and therefore is not precluded by the Act (15 USC § 7903 [5] [A] [iii]; *see A-1 Jewelry & Pawn, Inc.*, 247 FRD at 351; *Smith & Wesson Corp.*, 875 NE2d at 434), we need not address plaintiffs' further contention that this action falls within the PLCAA's negligent entrustment or negligence per se exception (*see* § 7903 [5] [A] [ii]; *Smith & Wesson Corp.*, 875 NE2d at 434-435).

IV

We further agree with plaintiffs that the court erred in dismissing the action against Brown for lack of personal jurisdiction inasmuch as they are entitled to discovery on that issue.  As the parties seeking to assert personal jurisdiction, plaintiffs bear the burden of proof on that issue (*see Castillo v Star Leasing Co.*, 69 AD3d 551, 551-552).  "However, in opposing a motion to dismiss pursuant to CPLR 3211 (a) (8) on the ground that discovery on the issue of personal jurisdiction is necessary, plaintiffs need not make a prima facie showing of jurisdiction, but instead must only set forth[] a sufficient start, and show[ ] their position not to be frivolous" (*Lettieri v Cushing*, 80 AD3d 574, 575 [internal quotation marks omitted]; *see Peterson v Spartan Indus.*, 33 NY2d 463, 467; *Gold Bullion Intl. v General Mills*, 53 AD2d 1045, 1045).  Thus, "plaintiff[s] need only demonstrate that facts *may exist* to exercise personal jurisdiction over the defendant[]" (*Tucker v Sanders*, 75 AD3d 1096, 1096 [emphasis added; internal quotation marks omitted]; *see Peterson*, 33 NY2d at 467).

CPLR 302 (a) (3) provides, in relevant part, that a court may exercise personal jurisdiction over a non-domiciliary who "commits a tortious act without the state causing injury to person or property within the state . . . if he [or she] . . . derives substantial revenue from goods used or consumed . . . in the state, or . . . expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce."  Here, there is no question that the complaint sufficiently alleges that Brown committed a tortious act outside New York that caused injury to a person inside New York (*see*

*id.; see generally Penguin Group [USA] Inc. v American Buddha*, 16 NY3d 295, 302). Specifically, plaintiffs allege that Brown unlawfully sold the subject gun in Ohio and that the gun was later used to shoot and injure plaintiff in New York.

We further conclude that the complaint sufficiently alleges that Brown expected or reasonably should have expected that his sale of guns to Bostic's trafficking ring would have consequences in New York (*see* CPLR 302 [a] [3] [ii]; *see generally LaMarca v Pak-Mor Mfg. Co.*, 95 NY2d 210, 215; *Darienzo v Wise Shoe Stores*, 74 AD2d 342, 346). The complaint alleges that Brown sold at least 140 handguns, including the gun used to shoot plaintiff, to Bostic and/or his straw purchasers over a relatively short period of time. According to plaintiffs, Bostic operated a trafficking scheme whereby he traveled to Ohio and used straw purchasers to buy large quantities of handguns. Bostic then returned to New York, where he sold the guns to other illegal traffickers or users. It is alleged that Brown knew or should have known of this scheme, yet he continued to supply handguns to Bostic via illegal straw purchases.

With respect to whether Brown "derives substantial revenue from goods used or consumed . . . in [New York]" (CPLR 302 [a] [3] [i]) or "derives substantial revenue from interstate . . . commerce" (CPLR 302 [a] [3] [ii]), we agree with plaintiffs that they are entitled to jurisdictional discovery on that issue because they "established that facts 'may exist' to exercise personal jurisdiction over [Brown] . . ., and made a 'sufficient start' to warrant further disclosure on the issue of whether personal jurisdiction may be established over [Brown]" (*Lettieri*, 80 AD3d at 575). As noted above, plaintiffs allege that in 2000 Brown sold at least 140 handguns to Bostic, a New York resident. In an affidavit submitted in support of his motion to dismiss, Brown averred that he sold a total of 181 handguns to Bostic and/or Bostic's alleged "business partners" between May and October 2000. Brown further averred that, from 1996 until 2009, he sold "roughly 5,000 firearms." Thus, the 181 handguns Brown sold to the Bostic trafficking ring in 2000 alone constituted 3.6% of Brown's total sales for that 13-year period. Assuming that the 5,000 handguns Brown sold from 1996 to 2009 were evenly distributed throughout that 13-year period, we estimate that Brown's sale of 181 guns to Bostic and his associates in 2000 constituted roughly 47% of his sales that year. We thus conclude that plaintiffs sufficiently established that facts may exist to demonstrate that Brown derived "substantial revenue" from his sales to the Bostic trafficking ring (*see LaMarca*, 95 NY2d at 213-215; *Tonns v Spiegel's*, 90 AD2d 548, 549; *Darienzo*, 74 AD2d at 344-346).

The fact that Brown garnered significant revenue from gun sales to a New York resident, however, does not establish that he "derives substantial revenue from *goods used or consumed . . . in [New York]*" (CPLR 302 [a] [3] [i] [emphasis added]). Rather, plaintiffs must establish that Brown profited from guns "used or consumed" – i.e., possessed or discharged – in New York (*see Tonns*, 90 AD2d at 549). In our view, plaintiffs made the requisite "sufficient start" by alleging, inter alia, that (1) Bostic was a resident of New York, (2)

Bostic operated a gun trafficking ring in New York, and (3) Brown supplied over 140 guns to Bostic and his associates, including the gun used to shoot plaintiff in New York, within a period of months.  In addition, plaintiffs cited an ATF report allegedly stating that the Hi-Point 9mm semi-automatic pistol, which is exclusively sold by MKS and/or Brown, "was the most popular pistol used in crimes in Buffalo in 2000."  We thus conclude that plaintiffs are entitled to discovery to determine how many of the guns Brown sold to Bostic were trafficked into New York and whether that amount is sufficient to conclude that Brown derived substantial revenue from guns used or consumed in this state (*see City of New York v Bob Moates' Sport Shop, Inc.*, 253 FRD 237, 240; *see generally Peterson*, 33 NY2d at 467; *Lettieri*, 80 AD3d at 576).

We further agree with plaintiffs that jurisdictional discovery is necessary to determine the nature of Brown's relationship with MKS. Plaintiffs allege that MKS is a two-person company and that "MKS essentially is Mr. Brown."  Indeed, Brown submitted an excerpt from a deposition in another case in which he testified that he owns 100% of the shares of MKS, and that he is the president of the company. Plaintiffs further allege that MKS "deals directly to over 35 New York dealers," that MKS sold at least 630 handguns traced to crime in New York, and that "[m]any of th[o]se handguns were sold to New York residents for use in New York."  Notably, MKS does not dispute that it is subject to personal jurisdiction in New York.  If MKS and Brown are indeed a single enterprise or share an agency relationship, then the admittedly interstate character of MKS may render Brown amenable to jurisdiction in New York (*see e.g. Darienzo*, 74 AD2d at 344-346; *see also Beatie & Osborn LLP v Patriot Scientific Corp.*, 431 F Supp 2d 367, 389).

Finally, there is no merit to Brown's contention, with which the court agreed, that plaintiffs are not entitled to discovery because their co-counsel had the opportunity to depose Brown in an unrelated case in 2005.  Even assuming, arguendo, that information gleaned by plaintiffs' co-counsel during the course of unrelated litigation could be somehow imputed to plaintiffs, we note that Brown was not a named party in that case, and thus New York's jurisdiction over Brown was not at issue.

V

Accordingly, we conclude that the order in appeal No. 1 should be reversed, defendants' motions should be denied, and the complaint against defendants should be reinstated.

Entered:  October 5, 2012                    Frances E. Cafarell
                                             Clerk of the Court