2025 IL App (1st) 231908
No. 1-23-1908
Opinion filed March 14, 2025

Sixth Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE CITY OF CHICAGO, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 21 CH 1987 |
| | ) | |
| WESTFORTH SPORTS, INC., | ) | The Honorable |
| | ) | Clare J. Quish, |
| Defendants-Appellee. | ) | Judge, presiding. |
| | ) | |

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Presiding Justice Tailor and Justice C.A. Walker concurred in the judgment and opinion.

**OPINION**

¶ 1    A gun dealer with actual or constructive knowledge that the buyer is a straw purchaser becomes an accomplice to the purchase-related crime. See *United States v. Carney*, 387 F.3d 436, 443 n.4, 448-50 (6th Cir. 2004). This complicity fuels illegal firearm trafficking, posing a severe threat to public safety. Straw purchases typically involve deliberate efforts to evade laws restricting firearm ownership strictly to those legally permitted to possess them. Common red flags include bulk buying of firearms, identical weapon sales, cash transactions, and structured purchases designed to evade scrutiny.

¶ 2    The City of Chicago sued Westforth Sports, Inc., a federally licensed firearms dealer in Gary, Indiana, 10 miles from the Illinois border, seeking injunctive and monetary relief. The City alleged that Westforth knowingly facilitated straw purchasers for Illinois buyers, resulting in firearms being used in Chicago crimes for years. Westforth challenged jurisdiction. It argued it lacked minimum contacts with Illinois and the City's claims were too remote from its conduct. The trial court agreed.

¶ 3    We reverse. The City has sufficiently alleged that over many years, Westforth deliberately and purposely availed itself of the Illinois market, fully aware that the firearms would contribute to criminal activity in Chicago. The alleged harms were neither incidental nor accidental but directly linked to Westforth's conduct, thus satisfying the legal standard for specific jurisdiction.

¶ 4                                    Background

¶ 5    Westforth, a federally licensed firearms dealer in Gary, Indiana, operates 10 miles from the Illinois-Indiana border. The store sells handguns and long guns to residents of Indiana and other states. Earl Westforth is president and secretary.

¶ 6                                   *The Complaint*

¶ 7    The complaint alleges that Westforth regularly transacted with multiple Illinois straw purchasers through several channels: (i) directly at its retail counter, (ii) advertising to out-of-state residents generally and Illinois residents in particular, (iii) through the Internet, and (iv) shipping firearms to Illinois dealers for transfer to Illinois residents. Between 2009 and 2016, the Chicago Police Department traced 856 crime firearms back to Westforth. From 2013 to 2021, the store allegedly sold 266 firearms illegally to 53 straw purchasers. Additionally, from January 2018 to April 2021, Westforth allegedly facilitated illegal sales of 157 long guns, 381 handguns, and 47 assault weapons to Illinois residents, generating over $320,300 in revenue.

¶ 8    Westforth was Chicago's largest out-of-state dealer for illegal firearms from December 2014 to April 2021. The complaint further alleged that 40% of federal firearm trafficking prosecutions in the Northern District of Indiana involved illegal firearms traced to Westforth.

¶ 9    Beyond the numbers, the complaint describes Westforth's pattern of ignoring warning signs. Employees allegedly overlooked red flags such as multiple purchases of identical firearms, structuring transactions to avoid reporting requirements by changing residency to Indiana, and customers openly admitting they were buying for others. Westforth reportedly had no policies to detect straw purchasers and even responded to inquiries on Google and Facebook about how Illinois residents could bypass legal restrictions. Also, the complaint, which included detailed summaries of many transactions, alleged the store destroyed records of failed background checks.

¶ 10                                    *Motion to Dismiss*

¶ 11    Westforth moved to dismiss for lack of jurisdiction under section 2-619 of the Code of Civil Procedure. 735 ILCS 5/2-619 (West 2020). Westforth argued that the City had failed to establish a *prima facie* basis for jurisdiction due to the lack of "minimum contacts" with Illinois required by the Fourteenth Amendment (U.S. Const., amend. XIV). Specifically, Westforth contended (i) it did not conduct business or target its activities toward Illinois in a manner relevant to the City's claims, nor (ii) did its firearm sales meet the requirement of minimum contacts with Illinois, citing *Rios v. Bayer Corp.*, 2020 IL 125020, and *Russell v. SNFA*, 2013 IL 113909.

¶ 12    In support, Earl Westforth, the store's president, submitted an affidavit stating that the store maintained "a passive, non-interactive website providing information about its location, hours and days of operation, and basic contact information." He claimed every purchaser had to complete a firearm transaction record and provide a valid government photo ID to verify residence and record the information. And he insisted that nothing connected the store-sold firearms with crimes in

Illinois and that he had not received specific information from law enforcement on the origin or use of traced firearms.

¶ 13   Furthermore, the affidavit asserted that the store's firearms license permitted sales only to Indiana residents, and it did not sell to Illinois residents if they came to the store. He claimed that since 2011, the store's advertising was confined to Indiana residents through advertising in Indiana publications and two billboards located in Indiana and had "never" targeted advertising to Illinois residents or advertised on radio or television. Explaining the store's online presence, the store listed itself on other license dealers' websites so prospective buyers could find its website, but it did not sell firearms online. In 2018, the store posted discounts for Indiana military veterans on Facebook, offering to help veterans of other states locate a firearms dealer.

¶ 14   Lastly, Earl Westforth stated that the store had turned over 556 pages of the Bureau of Alcohol, Tobacco, Firearms and Explosives "Form 3" transactional records and sale reports on Indiana residents who passed mandatory FBI background checks but refused broader disclosure, calling it too burdensome.

¶ 15              *City of Chicago's Response to Motion to Dismiss*

¶ 16   The City countered, citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985), to argue that Westworth purposefully directed its business at Illinois, satisfying the minimum contacts test under Illinois' long-arm statute. See 735 ILCS 5/2-209 (West 2020) (Illinois long-arm statute). In support, the City submitted Earl Westforth's deposition transcript, where he admitted (i) in 2014, he received an e-mail from the Department of Justice concerning a planned sting operation at the store, (ii) straw purchasers attempted firearms purchases with the intent of trafficking them to Chicago, and (iii) Illinois law enforcement, including the Chicago Police Department, contacted him several times in recent years about ongoing criminal investigations.

¶ 17    A former ATF agent's affidavit corroborated the pattern of firearm trafficking from jurisdictions with lax gun laws (like Indiana) to those with stricter gun laws (like Illinois and Chicago). The agent stated that this was "a well-known phenomenon *** and something that federal firearms licensees should know based on their knowledge of firearms regulations, ATF training, and interactions with ATF inspectors."

¶ 18    The City argued that Westforth's business model intentionally facilitated straw purchasers illegally purchasing firearms to be brought into Illinois, citing *Barone v. Rich Bros. Interstate Display Fireworks Co.*, 25 F.3d 610 (8th Cir. 1994). There, the court held that personal jurisdiction attaches when two entities cooperate in putting an item into the stream of commerce. *Id.* at 614.

¶ 19                                    *Discovery*

¶ 20    The City moved to compel the production of transaction records related to Illinois straw purchasers. Westforth responded that it could not be held responsible for what a third party does with a firearm after a purchase. The trial court granted limited discovery on the issue of personal jurisdiction.

¶ 21                              *Trial Court's Order*

¶ 22    The trial court dismissed the complaint with prejudice for lack of personal jurisdiction. The trial court held that, although the "related to" standard for minimum contacts with the forum state was "lenient," Westforth's ties to Illinois were "not enough for specific jurisdiction" under *Rios*, 2020 IL 125020. The trial court dismissed the case after finding no evidence of a bilateral relationship between Westforth and the straw purchasers. See *Hernandez v. Oliveros*, 2021 IL App (1st) 200032, ¶ 23 ("Bilateral acts can occur when two parties have a business relationship or contractual understanding that contemplates one party's acting for the benefit of both in the forum

state."). The City moved to modify the order and for leave to file an amended complaint. The trial court denied both motions.

¶ 23                                  Analysis

¶ 24                          *Standard of Review*

¶ 25    The plaintiff has the burden to make a *prima facie* showing that personal jurisdiction exists over a nonresident defendant. *Aspen American Insurance Co. v. Interstate Warehousing, Inc.*, 2017 IL 121281, ¶ 12; *Russell*, 2013 IL 113909, ¶ 28. Once the plaintiff meets this threshold, the defendant may rebut by offering uncontradicted evidence that effectively defeats it. *Fisher v. HP Property Management, LLC*, 2021 IL App (1st) 201372, ¶ 18. In making its decision, the trial court can examine various materials, including the complaint, affidavits, and depositions. See *Campbell v. Acme Insulations, Inc.*, 2018 IL App (1st) 173051, ¶ 10. Where the jurisdictional issue has been decided without an evidentiary hearing, our review is *de novo*, meaning we give no deference to the trial court and approach the question with fresh eyes. *Fisher*, 2021 IL App (1st) 201372, ¶ 18.

¶ 26    Besides the parties' briefs, the Giffords Law Center to Prevent Gun Violence, the Brady Center to Prevent Gun Violence, the mayor and city council of Baltimore, the City of San Jose, and the City of Kansas City filed an amicus brief. It "offer[s] *Amici*'s expert perspective on the issue of gun violence" and "illuminate[s] the issue's interdependence with the illegal straw purchasing of firearms."

¶ 27                          *Long Arm Statute*

¶ 28    This appeal asks whether Westforth's contacts with Illinois satisfy federal and Illinois due process requirements. See *Russell*, 2013 IL 113909, ¶ 30.

¶ 29    Illinois courts determine personal jurisdiction over a nonresident defendant based on section 2-209 of the Code of Civil Procedure. See 735 ILCS 5/2-209 (West 2020). Subsection (c),

relevant here, authorizes jurisdiction over nonresidents to the fullest extent allowed by the Illinois and the United States Constitutions. *Id.* § 2-209(c).

¶ 30 The constitutional analysis focuses on the relationship among the defendant, the forum, and the litigation. *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984). Jurisdiction depends on the defendant's conduct, which creates meaningful ties to the forum state rather than connections forged by the plaintiff. *Walden v. Fiore*, 571 U.S. 277, 285 (2014). The U.S. Supreme Court has upheld jurisdiction when a defendant intentionally reaches beyond state borders through deliberate actions directed at the forum state. *Burger King Corp.*, 471 U.S. at 480.

¶ 31 *Specific Jurisdiction*

¶ 32 Illinois courts may exercise personal jurisdiction over a nonresident defendant only if the defendant has "certain minimum contacts" with Illinois, ensuring that the lawsuit "does not offend traditional notions of fair play and substantial justice." (Internal quotation marks omitted.) *Aspen American Insurance Co.*, 2017 IL 121281, ¶ 14. The primary concern in a due process analysis involves the imposition on the defendant in forcibly litigating in a foreign forum. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980). Other factors include the efficient resolution of disputes, the plaintiff's interest in obtaining relief, and the shared interest of states in upholding substantive social policies. See *Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102, 113 (1987).

¶ 33 In evaluating minimum contacts, courts distinguish between general and specific personal jurisdiction. *Russell*, 2013 IL 113909, ¶ 36. General jurisdiction applies when a nonresident's connection to Illinois is so continuous and substantial that Illinois effectively serves as their home for legal purposes. Under these circumstances, courts may hear any claim against the defendant, even those unrelated to its activities in Illinois. *Aspen American Insurance Co.*, 2017 IL 121281,

¶¶ 14, 16. In contrast, specific jurisdiction applies when a lawsuit directly arises from or relates to the defendant's actions in the forum state. See *Burger King Corp.*, 471 U.S. at 472. This case involves specific jurisdiction.

¶ 34    Specific jurisdiction rests on satisfying two requirements—Westforth (i) must have purposefully directed activity toward Illinois, and (ii) the City's claims must arise from or relate to those activities. See *Russell*, 2013 IL 113909, ¶ 40 (citing *Burger King*, 471 U.S. at 472). The requirement that the claim "arose out of" or "relates to" as to a defendant's forum contacts is lenient and flexible. *Id.* ¶ 83.

¶ 35    A defendant that purposefully engages in commercial activities with residents of another state or actively directs business into another state should anticipate the possibility of litigation there. See *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. 351, 359 (2021); *World-Wide Volkswagen Corp.*, 444 U.S. at 295-297. By choosing to do business beyond their home state, the defendant effectively consents to be held accountable for the consequences of those decisions. *Burger King Corp.*, 471 U.S. at 473 (citing *Travelers Health Ass'n v. Virginia ex rel State Corp. Comm'n*, 339 U.S. 643, 647 (1950)).

¶ 36                    *Arguments of Parties*

¶ 37    Did Westforth purposely establish a connection with Illinois, and do the City's claims arise from or relate to that connection?

¶ 38    The City asserts that Westforth purposely sought to profit from Illinois residents, including those who engaged in illegal firearm transactions, thereby satisfying the minimum contacts necessary for jurisdiction. Westforth allegedly ignored numerous red flags indicative of straw purchasing—bulk sales, cash transactions, and repetitive and staggered sales designed to avoid detection. Westforth's records show that multiple Illinois purchasers later faced criminal charges

for possession of firearms purchased from Westforth. The complaint details specific names and transactions that, the City argues, put Westforth on notice about straw purchasers and illegal transactions.

¶ 39    According to the City, Westforth employees actively assisted Illinois residents in evading Indiana residency requirements, including advising them to falsify residency information, practices that transformed Westforth into a critical pipeline for illegal firearms entering Illinois, particularly Chicago. Westforth trained employees to sell handguns and long guns to Illinois residents, unusual for a store purporting Indiana-only sales. Indeed, employees stated that Illinois sales were "just a normal part of their daily operations," and Earl Westforth reprimanded them if they did not complete a sale to an Illinois resident. The City also points to Westforth's substantial revenue from Illinois-connected sales.

¶ 40    In sum, the City argues that Westforth (i) knew straw purchasers frequented the store; (ii) knew these firearms were trafficked to Chicago; (iii) knew or had reason to have known that specific transactions involved straw purchasers; (iv) had a financial incentive to consummate straw purchases; (v) received repeated citations for facilitating illegal straw sales, along with remedial training to detect straw purchasers, but refused to implement recommended safeguards; and (vi) deliberately adopted a "head in the sand" approach to profit from the illegal firearms market in Chicago.

¶ 41    The City draws comparisons to *Kothawala v. Whole Leaf, LLC*, 2023 IL App (1st) 210972, where the court found that selling nearly 2 million batteries in Illinois was neither accidental nor unforeseeable but constituted purposeful availment. The City maintains that Westforth's years-long sales pattern and deliberate conduct similarly satisfy the purposeful availment standard, as its firearms were repeatedly traced to Illinois crimes. This pattern of repeated and systematic contact

9

with firearms ending up in Illinois amounts to "willful blindness," argues *amici*, reinforcing the City's contention that Westforth established minimum contacts by knowingly supplying firearms destined for Illinois.

¶ 42    Westforth disputes the City's characterization, arguing that it only sold to Indiana residents and should not be subject to Illinois jurisdiction. Westforth offers a simplistic (and inaccurate) summary of the City's position, arguing it "boil[s] down to essentially: 1) people sometimes straw purchase firearms and traffic them across state lines, 2) federal firearms licensees are aware of the existence of straw purchasing, and 3) Westforth is near the Illinois border."

¶ 43    Westforth insists that its commercial activity does not meet the requisite purposeful availment of the Illinois market. According to Westforth, the sale of firearms to Indiana residents does not implicate direct conduct with Illinois, and the store received no benefit from any conduct with Illinois. Westforth contends that the City focuses on the actions of third-party purchasers over whom Westforth had no control or knowledge after a purchase. It claims to have never received identifying information about individual crimes, and accordingly, its sales do not constitute minimum contacts with Illinois. Westforth also insists that its online activity was insignificant and its advertising was aimed solely at Indiana residents.

¶ 44    Westforth relies heavily on *Walden*, 571 U.S. 277, which held that mere foreseeability of an impact in another state does not establish jurisdiction. *Id.* at 290. In *Walden*, the Court ruled Nevada could not exercise jurisdiction over a Georgia officer who confiscated money from travelers bound for Nevada because the officer's conduct lacked a deliberate connection to Nevada. *Id.* at 289. Similarly, Westforth argues it's an Indiana-centered operation that strictly sells to Indiana residents who present a valid Indiana government ID and pass background checks, so *Walden* prohibits Illinois courts from exercising specific jurisdiction.

¶ 45                               *Purposeful Availment*

¶ 46     The minimum contacts test determines whether a court may exercise personal jurisdiction over a defendant. Jurisdiction is proper when a defendant has purposefully availed themselves to the forum state, and the cause of action arises out of or relates to those contacts. *Fisher*, 2021 IL App (1st) 201372, ¶ 22. The United States Supreme Court has emphasized that purposeful availment prevents a defendant from being subjected to jurisdiction based on random, fortuitous, or attenuated contacts, or on the unilateral actions of another party or third person. *Burger King Corp.*, 471 U.S. at 475. This ensures that the exercise of jurisdiction aligns with " 'traditional notions of fair play and substantial justice.' " *Wiles v. Morita Iron Works Co.*, 125 Ill. 2d 144, 150 (1988) (quoting *International Shoe Co. v. Washington* 326 U.S. 310, 316 (1945)).

¶ 47     Based on the record before us, we conclude that Westforth's extensive and years-long transactions with straw purchasers for sales destined for Illinois were not random, fortuitous, or attenuated. The City has demonstrated that Westforth knowingly engaged in illegal firearm sales aimed at Illinois and Chicago, a fact Westforth seeks to either downplay or ignore.

¶ 48     Westforth's link to Chicago is more than geographical. From 2009 to 2016, the Chicago Police Department traced over 850 firearms used in city crimes to Westforth, making it the largest out-of-state supplier of firearms used in crimes in Chicago. These numbers underscore a recurring link between Westforth's operations and Chicago's illegal gun market.

¶ 49     The complaint sets forth years of transactions with Illinois residents, including known straw purchasers who trafficked firearms into Chicago. These activities go beyond incidental business with Illinois; it was a business model. Allegedly, Westforth employees routinely facilitated these transactions by providing instructions on circumventing regulations and

disregarding glaring indicators of illegal activity. Employees admitted that sales to Illinois residents were routine and daily, which management actively encouraged.

¶ 50      The highly suspicious nature of these transactions underscores Westforth's role in illegal trafficking. Tellingly, Westforth submitted no evidence of maintaining a "do not sell to" list. This omission was not an oversight but a deliberate refusal to control illegal sales. The training of employees to serve Illinois buyers illustrates this, along with alleged advice on how to avoid Indiana's residency requirements. See *United States v. Inglese*, 282 F.3d 528 (7th Cir. 2002) (firearms licensee employees properly convicted for knowingly making fraudulent sales to straw purchasers). Westforth's hundreds of transactions with known straw purchasers go far beyond incidental business with Illinois; Westforth sought it out, cultivated it, and profited from it.

¶ 51      Westforth's claim of ignorance unravels under scrutiny. Courts have consistently rejected willful blindness as a defense when a defendant "knew or should have known" the consequences of their actions. See *Williams v. Beemiller, Inc.*, 100 A.D.3d 143, 153 (N.Y. App. Div. 2012) (federally licensed firearm dealer in Ohio "expected or reasonably should have expected" obvious straw purchases to interstate trafficker "would have consequences in New York"); see also, *e.g.*, *Strabala v. Zhang*, 318 F.R.D. 81, 111 (N.D. Ill. 2016) (defendant turning "blind eye to the natural consequences of [its] actions"(internal quotation marks omitted)); *Kollmorgen Corp. v. Yaskawa Electric Corp.*, 169 F. Supp. 2d 530, 534-35 (W.D. Va. 1999) (defendant " 'professing ignorance' " and "deliberately tak[ing] steps to keep itself in the dark" about destination of its goods); *Barone*, 25 F.3d at 613-14 (defendant's ignorance "defie[d] reason and could aptly be labeled 'willful' ").

¶ 52      Another example of willful ignorance is *Delahanty v. Hinckley*, 686 F. Supp. 920, 923-24 (D.D.C. 1986). There, the court identified purposeful availment where a firearms manufacturer

and distributor knowingly served the surrounding metropolitan area, did so readily, and neglected to prevent the distribution of their firearms to criminals.

¶ 53    Westforth's reliance on *Walden*, 571 U.S. 277, is misguided. Unlike the officer in *Walden*, Westforth's actions directly and repeatedly connected it to Illinois. The complaint alleges that Westforth not only sold firearms to Illinois residents but also ignored law enforcement citations for straw purchasing violations. Moreover, Westforth failed to implement remedial measures and facilitated transactions it knew, or should have known, would lead to illegal trafficking. This case is not about accidental or incidental conduct in a neighboring state but involves deliberate conduct aimed squarely at Illinois.

¶ 54    Westforth cannot credibly claim ignorance when the record is replete with evidence that Westforth knew it was operating as a pipeline for illegal weapons into Chicago. In other words, Westforth's conduct was not one of passive indifference. Instead, Westforth made a deliberate choice to facilitate and profit from illegal firearm sales destined for Chicago's streets. Whether affirmative conduct or willful inaction, Westforth systematically enabled straw purchases to flourish, satisfying purposeful availment.

¶ 55                                *Arising out of/Related to*

¶ 56    The next step in the analysis involves the plaintiff establishing that their claims satisfy one of two separate tests: (i) arise out of the defendant's contacts with the forum or (ii) relate to the defendant's in-forum activities. See *Russell*, 2013 IL 113909, ¶ 74; *Kothawala*, 2023 IL App (1st) 210972, ¶¶ 25, 40. This ensures jurisdiction based on intentional conduct, contrasted with random or incidental contacts with the forum state. *Russell*, 2013 IL 113909, ¶ 42 (citing *Burger King*, 471 U.S. at 475). Again, the standard has been described as "lenient" or "flexible." *Id.* ¶ 83.

¶ 57   Westforth argues that its firearm sales were intended for Indiana residents and do not relate to the City's claims of straw purchasing and firearm trafficking. Westforth further asserts it had no duty to monitor legally purchased firearm use even if it had knowledge or suspicion of a third party's intentions, citing *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873, 882-883 (2011) ("[I]t is the defendant's actions, not [its] expectations, that empower a State's courts to subject him to judgment.").

¶ 58   The City counters that Westforth feigned ignorance of trafficking of its firearms. To demonstrate its active complicity in trafficking, the City highlights the store's history of repeated sales to known straw purchasers that it knew or should have known funneled illegal firearms into Chicago, as evidenced by the former ATF agent's affidavit. Westforth's refusal to act, the City asserts, shows a deliberate choice to profit from the illicit firearms market just 10 miles from its front door.

¶ 59   Neither "arising from" nor "related to" demands strict causation or that the defendant's actions be the sole or exclusive cause of the harm. This permits a broader evaluation of the relationship between the plaintiff's claims and the defendant's contacts with the forum state. For example, in *Myers v. Casino Queen, Inc.*, 689 F.3d 904, 913 (8th Cir. 2012), the Eighth Circuit underscored the necessity of a flexible standard that considers the totality of the circumstances when analyzing how the defendant's conduct relates to the plaintiff's claims. Similarly, in *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1267 (6th Cir. 1996), the court asserted that if a defendant's contacts with the forum state are sufficiently connected to the operative facts of the controversy, the action will be deemed to have arisen from those contacts.

¶ 60   Minimum contacts depend on assessing "the quality and nature of defendant's activity" in each case. *Chicago Film Enterprises v. Jablanow*, 55 Ill. App. 3d 739, 741-42 (1977). We find the

allegations in the complaint, the affidavits, and other documents in the record establish an unrebutted *prima facie* case that the alleged harm arises from Westforth's systematic and deliberate years-long practice of selling to Illinois straw purchasers, thereby embracing the Illinois market far beyond mere fortuity. Not only did the store refuse to implement basic safeguards against straw purchasing, but all the while, it ignored numerous red flags, among them multiple law enforcement visits and citations connecting its firearms to Illinois criminal activity.

¶ 61    The record demonstrates Westforth was acutely aware of and intended to facilitate trafficking of firearms into Illinois through straw purchasers. Indeed, "arising from" encompasses a defendant deliberately reaching out to the forum state—such as by " 'exploi[ting] a market' " in that state. See *Ford Motor Co.*, 592 U.S. at 359 (quoting *Walden*, 571 U.S. at 285). By exploiting the illegal firearm market in Chicago, Westforth cemented a strong relationship among itself, Illinois, and the litigation, thereby satisfying the "arising from" requirement. See *Russell*, 2013 IL 113909, ¶ 30.

¶ 62                                        *Reasonableness*

¶ 63    We also consider whether requiring Westford to litigate in Illinois is reasonable. *Id.* ¶ 87. *Russell* lists four factors in determining reasonableness: (i) the burden on the defendant litigating in a foreign forum, (ii) the forum state's interest, (iii) the plaintiff's interest in obtaining relief, and (iv) the interests of other affected forums in judicial efficiency and policy advancement. *Id.*

¶ 64    Regarding the first factor, litigating in Illinois is not an unreasonable burden for Westforth, given its years of knowingly profiting from Illinois' illicit firearms market and interactions with law enforcement officials and Illinois residents. Next, Illinois has a strong interest in resolving the dispute because a significant number of illegally trafficked firearms used in crimes in Chicago trace back to Westforth, impacting public safety and law enforcement efforts. Third, the City has

a compelling interest in obtaining relief, as the illegal firearms supplied by Westforth have contributed to violent crime and imposed significant costs on the City. Concerning the interests of other affected forums, litigating the case in Illinois promotes judicial efficiency by addressing the issue where the harm occurred while furthering substantive policies against illegal gun sales. Indiana's interest does not have the same urgency or impact as Illinois'.

¶ 65                                   *Leave to Amend the Complaint*

¶ 66    Next, the City argues the trial court erred by denying its motion to amend the complaint. Because we have reversed on jurisdiction, we need not address this issue. We note, however, that while not absolute, amendments should be liberally allowed unless doing so would prejudice the opposing party. *Bank of Northern Illinois v. Nugent*, 223 Ill. App. 3d 1, 13 (1991).

¶ 67    Reversed and remanded.